ELDA SPADACCINI, as Administratrix of the Estate of SANTO SPADACCINI, Deceased, Respondent, v JOHN M. DOLAN, Doing Business as WESTCHESTER SQUARE HOSPITAL, et al., Appellants, et al., Defendants.

First Department, July 13, 1978

## APPEARANCES OF COUNSEL

*William F. O'Connor* of counsel (*Kathryn Deborah Nealon* with him on the brief), for John M. Dolan, doing business as Westchester Square Hospital, and another, appellants.

*Norman Bard* of counsel (*Sandra Krevitsky* and *Walter A. Begos* with him on the brief; *Anthony L. Schiavetti,* attorney), for Pincus Sherman and another, appellants.

*Thomas R. Newman* of counsel (*Toberoff & Gould* with him on the brief; *Mario J. Cusati,* attorney), for respondent.

## OPINION OF THE COURT

Fein, J.

Defendants Westchester Square Hospital and Doctors Sherman, Di Salvo and Nisi appeal from a judgment entered after trial on a jury verdict in favor of plaintiff in this action to recover damages for the wrongful death of Santo Spadaccini and for the conscious pain and suffering allegedly endured by him during the period he lingered in the hospital prior to his death on April 19, 1970. The jury returned a verdict in favor of plaintiff on the cause of action for wrongful death in the sum of $350,000, apportioned 80% against the doctors and 20% against the hospital and, on the cause of action for conscious pain and suffering, in the sum of $25,000 against the doctors and $25,000 against the hospital.

On this appeal, defendant doctors assign as error the failure of the Trial Justice to instruct the jury that mere error of judgment is not malpractice particularly after having advised counsel, at the conference held prior to closing statements pursuant to CPLR 4110-b, that the court would charge the jury in substance that defendant doctors were required to exercise reasonable care in the care and treatment of decedent, but could not be held liable for mere error of judgment. It is undisputed that no instruction was given to the effect that the doctors could not be held liable for mere error of judgment. The doctors contend they were entitled to such a charge on the facts of this case. They assert that in any event reversal is required because the court deviated in this respect from the commitment made to counsel prior to closing statements.

Defendant hospital contends that (1) the proof against it was insufficient for submission to the jury; and (2) plaintiff failed to make out a prima facie case. All defendants further claim that (1) the verdict in both the death action and the survival action for conscious pain and suffering was excessive; (2) the jury's apportionment was improper; and (3) the judgment entered in the sum of $50,000 on the cause of action for conscious pain and suffering, 50% against the doctors and 50% against the hospital was improper in view of the jury's 80%-20% apportionment on the wrongful death cause. Defendants also claim that the verdict for pain and suffering was in the total sum of $25,000 and that even in that amount, it was excessive.

Essentially this is a case where the decedent received suc-

cessful surgical treatment, but allegedly died as a result of improper attention and treatment following surgery. For several days decedent complained of a swelling of the tongue and pain in the mouth. He was referred to Westchester Square Hospital by Dr. Procario, a general practitioner, who called in Dr. Sherman, a head, neck and plastic surgery specialist. Dr. Sherman diagnosed the condition as Ludwig's Angina and advised that immediate surgery was required. In diagnosing the condition as Ludwig's Angina, Dr. Sherman noted a severe infection, evidenced by marked swelling under the chin and marked edema of the floor of the mouth. The condition is usually caused by a dental infection which can spread from the bottom front of the mouth in toward the back of the tongue and, if not treated, can cause swelling on the outside of the neck. Primary treatment is administration of anitbiotics and/or surgery.

Subsequent to decedent's admission, Dr. Sherman performed the operation on March 27, 1970, consisting of an incision and drainage through the neck to the floor of the mouth. Following the operation, decedent was placed in a private room to insure necessary isolation precautions because of the severe infection. Dr. Sherman had ordered that a tracheotomy set be placed in the room in the event of any upper respiratory difficulty. Decedent was not placed in an intensive care unit, nor does it appear that there was an intensive care unit in the hospital, other than a coronary care unit for treatment of coronary patients. Although certain precautions were taken, the private room in which decedent was confined was admittedly not made the equivalent of an intensive care unit (ICU). It did not have the equipment normally found in such a unit. Nor did it have an ICU nurse or doctor constantly present in the event of an emergency. Although decedent did have a private room with a private duty nurse, this was not the equivalent of ICU confinement.

Subsequent to the operation, decedent developed pneumonia in the left lung, at which point Dr. Procario called in Dr. Nisi and his partner, Dr. Di Salvo, internists. They rendered medical treatment to decedent during the postoperative period. None of the doctors ordered a tracheotomy either during the operation or during the postoperative period, a procedure which even defendants' expert, Dr. Cohen, testified "should always be considered in a case of Ludwig's Angina in order to prevent respiratory distress." Plaintiff's expert, Dr. Greene,

also testified to the necessity of a tracheotomy to assure the protection of the patient's airway where there is a threat of respiratory obstruction. Indeed the presence of a tracheotomy set in decedent's room indicated some awareness by all of the treating physicians as to the possible or potential need to administer a tracheotomy.

Plaintiff's primary claim of negligence against the doctors was their failure to order an elective prophylactic tracheotomy or a tracheotomy during the postoperative period and their failure to insure that decedent was placed in an intensive care unit or the equivalent. The sufficiency and the adequacy of the medical treatment accorded decedent was clearly a question for resolution by the jury.

As to defendant hospital, plaintiff's allegation of negligence concerned the manner in which the hospital reacted when decedent went into respiratory arrest and a code 54 was announced throughout the hospital. Code 54 is an emergency code indicating that a patient is in immediate danger of death. It indicates that the patient is in distress and needs immediate resuscitation and emergency treatment. The evidence was sufficient for a finding that there was a delay of some 15 minutes between the time the code 54 was issued and the time a doctor responded thereto.

The evidence was adequate to present a jury question as to whether defendant hospital and its staff timely responded to the emergency code. According to the proof, decedent began choking and turning blue at 7:55 P.M. The code 54 was not called until 8:00 P.M. and a tracheotomy was not begun until at least 8:15 P.M. We find the evidence sufficient to present a question for the jury whether the delay in responding after the code 54 call was turned in conformed to proper and accepted medical practice and was a proximate cause of the death. The hospital entries leave much to be desired. Even assuming the accuracy of the hospital record, there appears to have been at least a 15-minute delay during which Mr. Spadaccini went into cardiac arrest and sustained the irreversible brain damage which led to his death some 21 days later on April 19, 1970. The proof was sufficient for a jury to find that the hospital did not timely respond to the code 54. On the basis of the evidence, it cannot be ruled as a matter of law, as the hospital apparently contends on this appeal, that by the time the code 54 was sounded or within a minute thereafter irreversible brain damage already existed, which

the hospital was powerless to prevent. These were questions for the jury, which by its verdict resolved them against the hospital.

The primary legal issue raised by the doctors is the sufficiency of the trial court's charge to the jury and its refusal to charge "error of judgment", in the face of the court's advice to counsel prior to summation that it would in substance instruct the jury as to the applicable malpractice principles announced by the Court of Appeals in *Pike v Honsinger* (155 NY 201), embodied in PJI 2:150, including the "error of judgment" charge. Defendants contend that the refusal of the court to charge as indicated violated the statute (CPLR 4110-b), since it prejudiced counsel who tailored his closing statement to the substance of what he anticipated would be contained in the charge to the jury. Defendants further claim that it was error not to instruct the jury as to "error of judgment", which defendants claim is a standard instruction in any malpractice case and required in this case.

██ ██ We disagree. The court's refusal to use the "error of judgment" language was proper. Such a charge under the facts here presented would have been unwarranted. We further conclude that no prejudice resulted to defendant doctors. They have failed to demonstrate that they were misled to their prejudice at the conference held with the court at which the court advised the respective parties of "proposed action" which would be taken with respect to requests to charge which had been submitted (CPLR 4110-b).

The law applicable in medical malpractice cases was succinctly set forth in *Pike v Honsinger (supra,* pp 209-210): "The law relating to malpractice is simple and well settled, although not always easy of application. A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law placed upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery. Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his

knowledge. The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. The rule in relation to learning and skill does not require the surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such as is possessed by the average member of the medical profession in good standing. Still, he is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions may have been. The rule of reasonable care and diligence does not require the exercise of the highest possible degree of care, and to render a physician and surgeon liable, it is not enough that there has been a less degree of care than some other medical man might have shown, or less than even he himself might have bestowed, but there must be a want of ordinary and reasonable care, leading to a bad result * * * The rule requiring him to use his best judgment does not hold him liable for mere error of judgment, provided he does what he thinks is best after careful examination. His implied engagement with his patient does not guarantee a good result, but he promises by implication to use the skill and learning of the average physician, to exercise reasonable care and to exert his best judgment in the effort to bring about a good result. [Citing cases.]"

*Toth v Community Hosp. at Glen Cove* (22 NY2d 255) recognized that a specialist should be held to the degree of care and treatment expected of specialists in the community where he practices. That case served to differentiate between the degree of care to which a specialist is held as opposed to that to which a general practitioner is held, by giving cognizance to the superior knowedge, skill and intelligence of the specialist in treatment rendered to patients in the area of his specialty. The substantive law set forth in these two cases was adopted in the formulation of the standard instruction set forth in the New York Pattern Jury Instructions (PJI 2:150). However, as observed by the trial court in this case, the Pattern Jury Instructions are only intended as a guide to the Trial Justice. There may be situations where, as here, portions of what is recommended in Pattern Jury Instructions need not or should not be charged. As the instructions themselves advise it is the Trial Justice's primary responsibility to in-

struct the jury on the applicable law in the case. It is also the responsibility of attorneys in representing their clients at the trial, to submit requests to charge which are warranted by the actual evidence and the relevant law so that a meaningful discussion may be had between counsel and the court as to the applicable law in relation to the proof adduced.

Here, in a conference held at the close of the evidence in accordance with CPLR 4110-b, defendant doctors requested that the court charge as follows: "18. If you find that there was an error of judgment made by any of the defendants—the court is not suggesting that there was or was not—you are not to infer or to attribute negligence from such mere error of judgment since the standard of care required of a physician allows for errors of judgment reasonably to be expected in the context of the circumstances in which doctor or doctors operated and treated." No basis was shown for such a charge. However, in conjunction with this request, the Trial Justice restated the *Pike v Honsinger* (155 NY 201, *supra)* standard as follows: "What you're talking about is the rule in performing a medical service the doctor's *[sic]* obligated to use his best judgment, to use reasonable care in exercise of his knowledge and ability. The rule requiring him to use his best judgment does not make him liable for a mere error of judgment provided he does what he thinks is best after careful consideration. The rule of reasonable care does not require every possible degree of care; it requires only that he exercise that degree of care that a reasonable prudent doctor—or we can name the specialist—would exercise under the similar circumstances." The court further stated: "If that's your request, in substance, that's what I will charge." Plaintiff's attorney had no objection and defendants' attorney responded that such a charge would be satisfactory.

When the Trial Justice delivered his instructions to the jury, he did not use the "mere error of judgment" language. However he did properly charge the rule of reasonable care.

He instructed the jury as follows: "By undertaking to perform a medical service he does not, nor does the law require him to guarantee a good result. He is liable only for negligence or, as I said, as it's sometimes called, malpractice, the terms are used interchangeably in connection with the doctor. A doctor who renders a medical service is obligated to have that reasonable degree of knowledge and ability that is expected of specialists who do that particular operation or

treatment in the community where he practices, and that's the City of New York. The law recognizes that there are differences in the ability of doctors, just as there are in the ability of people engaged in other activities. To practice his profession, a doctor is not required to be possessed of the extraordinary knowledge and ability that belongs to a few men in rare endownments, but he is required to keep abreast of the times and to practice in accordance with the approved methods and means of treatment in general use or, as has been stated in the course of this trial, in accordance with medically accepted standards and practices in the community. The standard to which he is held is measured by the degree of knowledge and ability of the average surgeon or internist in good standing in the community where he practices. If a patient should die while undergoing medical care and that death results from the doctor's lack of knowledge or ability, or his failure to exercise reasonable care, which means the failure to comply with or conform with the medically accepted standards and practices in his community, then he is responsible for the deaths [sic] that is a result of his acts and in this respect, you are to decide the issues as I set them forth as to the malpractice or the negligence of the doctors."

■ The court also charged "proximate cause." The court, however, did not use the following language from *Pike v Honsinger (supra,* p 210), which is also set forth in PJI 2:150: "The rule requiring him to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after careful examination." Defendants claim that such a charge is standard and must be given in every malpractice case. The contention however, lacks merit. Each case must stand or fall on its own facts. With few exceptions, it cannot be said that any particular legal standard must be charged in every conceivable case. If the facts do not require a particular instruction a Trial Justice should not give it. Merely because a particular instruction is generally given in a particular type of case and is included in the standard PJI instruction and comes from a leading case does not require it in every case of that genre. The court's instruction on the law, is, rather, to be molded by the applicable facts.

*Pike v Honsinger* (155 NY 201, *supra)* sets forth two applicable standards of care to be applied in malpractice cases. The first, which was correctly charged here, holds the doctor to the

standard of care measured by the knowledge and ability of the average physician or specialist in good standing in the community where he practices. This is the standard of reasonable care. Liability is premised upon the failure to exercise reasonable care, so measured. A doctor is also subject to a separate duty which requires him to use his best judgment, but which does not make him liable for a mere error of judgment, provided he does what he thinks is best after careful examination. This latter instruction was not given in this case. Nor, on the facts presented, would it have been appropriate for the court to so charge the jury. An error of judgment charge is appropriate in a case where a doctor is confronted with several alternatives and, in determining appropriate treatment to be rendered, exercises his judgment by following one course of action in lieu of another. That is not the situation here.

■■ Here, the evidence was sufficient for a jury to find that one of three preventative measures should have been taken in the treatment rendered to Mr. Spadaccini in order to avoid or guard against the consequences of respiratory arrest: (1) placement of the patient in an intensive care unit (ICU) or his confinement in the equivalent of an ICU setup, including a nurse trained in ICU procedures and full equipment necessary to be employed where a patient is under intensive care supervision; or (2) a prophylactic, preventative elective tracheotomy; or (3) a tracheotomy in the postoperative period to assure proper respiration. Except for the jury issue as to whether the unit used was sufficient, the doctors took none of these measures. This is undisputed. Hence there was no issue to submit to the jury as to whether defendant doctors exercised their best judgment in electing to proceed with one course of treatment in lieu of another. Rather, the facts raised in issue and the court properly submitted for disposition by the jury whether the conduct of defendants in failing to follow any of these procedures conformed to accepted standards of medical care, the standard of reasonable care charged by the court. The "error of judgment" charge implies the exercise of some judgment in choosing from among two or more available alternatives. Where a physician is confronted with alternate means of treatment and elects to follow none of the alternatives, it is unnecessary to charge error of judgment, since the issue is preserved by the required charge as to whether the doctor exercised the degree of care a reasonably prudent

doctor or specialist would have exercised under the same circumstances.

This is clearly demonstrated by the procedure utilized by the Trial Justice. He submitted a verdict sheet to the jury on which the jury reported its verdict in pertinent part, as follows: "2. In accordance with my charge was Dr. Sherman negligent in treating the decedent, in any or all of the following respects:

"a. without a prophylatic, preventative or elective tracheotomy Yes X    No ___

"b. without placing decedent in an Intensive Care unit or its equivalent? Yes X    No ___

"c. without a tracheotomy in the post-operative period (3/27-2/29) Yes X    No ___". The jury's answers are significant. They were not misled.

In the course of his charge describing the verdict sheet the Trial Justice carefully, clearly and properly charged the jury that they were to determine with respect to each of these questions whether the doctors were negligent in failing to perform the tracheotomy or to put the decedent in an intensive care unit or its equivalent. He instructed the jury they were to determine their answers based upon the evidence and the standard of reasonable care he had charged. The jury was charged that it was to determine as to each alternative whether the failure to utilize it was negligence. This is all defendants were entitled to by way of jury instructions. To the extent that error of judgment is appropriate to this case it was implicit in the charge as given and the verdict sheet. The jury was plainly and clearly and properly advised of the standard by which to determine whether the failure of the doctors to adopt any of these alternatives was or was not negligence. This is all that the "error of judgment" words could properly cover. The failure to use them was not error.

Nor is it conceivable that counsel was misled. We do not have the benefit of the summations, which were not transcribed, but it is obvious competent counsel would and undoubtedly did discuss these alternatives and ground his argument on the contention that the decision not to adopt any of them was not negligence because it did not deviate from the reasonable care standard measured by the skill, learning, care and judgment of physicians and surgeons practicing in the community.

■ We find no such substantial violation of CPLR 4110-b as to require a reversal and remand for a new trial. The statute directs that at the close of the evidence, or at such earlier time during the trial as the court may reasonably direct, the court shall inform counsel "of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed." When the court advised counsel following the charge that it did not consider the error of judgment charge to be appropriate under the circumstances, defense counsel excepted and requested that a further charge be given. Counsel did not request an opportunity to reopen his summation. As noted, it does not appear that defense counsel's summation would have been in any way different had the court advised beforehand it would not instruct the jury as to error of judgment. Although the court erred in not adhering to the approved and proper practice set forth in the statute, under the facts in this case we do not find the error prejudicial so as to constitute reversible error and require remand for a new trial. We agree with the dissent that the court, after formulating its charge and reaching the conclusion that it would be inappropriate to charge error of judgment, should have so advised counsel and should have afforded the defense attorney an opportunity to reopen his summation. However, as noted, defense counsel made no such request. We do not find any resulting prejudice to defendant doctors. A mere conclusory assertion of resulting prejudice is insufficient. Although Trial Justices should avoid the practice followed here, the error does not require reversal in this case.

■ ■ The statute (CPLR 4110-b) does not require that the court in every case charge the jury in strict conformity with its rulings on requests to charge submitted by the respective parties. The fact that an improper ruling on a request is given does not require that the court improperly instruct the jury in conformity with its prior improper ruling. The statute refers to "proposed action" by the court with respect to requests to charge submitted by parties to an action. The use of the term "proposed" is of some significance and is indicative of a legislative intention that the court have some flexibility with respect to its rulings on requests to charge submitted in accordance with the statute. Proper practice requires that Trial Justices afford the parties an additional opportunity to make closing statements to the jury when the court alters its

position with regard to its rulings on such requests. However, in this case, we do not find that the failure to do so warrants the direction of a new trial.

Also lacking in merit is defendants' contention that judgment was improperly entered on the cause of action for conscious pain and suffering. Defendants claim that judgment should not have been entered in the sum of $50,000 and that the proper judgment should have been in the sum of $25,000 which defendants assert is, in any event, excessive. The verdict sheet showed the following responses by the jury:

"5. Was there conscious pain and suffering? Yes X    No ___

"6. If the answer is yes, state the amount you find each defendant is liable for, if any.

     Hospital $25,000
     Doctor $25,000".

■ It is fairly clear that the jury's verdict on the conscious pain and suffering claim was in the amount of $25,000 against the hospital and $25,000 against the doctors. The total verdict on that cause, accordingly, was $50,000, apportioned 50% against the hospital and 50% against the doctors. The fact that the jury had apportioned damages for wrongful death at 80% against the doctors and 20% against the hospital is not dispositive and does not preclude a different apportionment on recoverable damages for conscious pain and suffering. Decedent lingered for a 21-day period prior to his death. However, we find the award of damages for pain and suffering in the amount of $50,000 to be excessive and would reduce the award on that cause of action to the sum of $25,000, which, under the circumstances of this case, should be apportioned in the same manner as the jury apportionment with respect to damages for wrongful death, i.e., 80% against defendant doctors and 20% against defendant hospital. Although defendants claim that decedent was in a coma during the 21-day period after the respiratory and cardiac arrest episode on March 29, 1970, there is sufficient evidence for a jury to have found that he was conscious during part of that period of time. Mrs. Spadaccini testified that she had visited her husband every day and on two occasions he opened his eyes and appeared to be crying. She also observed that he was trying to form words but was unable to do so. Under the circumstances, the record is sufficient to sustain the jury's finding of conscious pain and suffering, reduced to the extent directed.

We also find the jury's award of damages for wrongful death to be excessive. Decedent was 47 years of age at the time of his death and left surviving plaintiff, his widow, who was then age 46 and two minor children, a 6-year-old son and a 12-year-old daughter. Decedent's life expectancy was 25.6 years and he had a work expectancy of 18 years. According to the proof, decedent had been working in a bar owned by his brother and earned between $9,820 and $11,380 per year. His employer testified that had he been working at the time of trial he would be earning between $15,000 and $18,000 per year. Defendants place primary reliance upon the fact that decedent allegedly was not reporting all his income for tax purposes and that he had been receiving a 50% disability pension of $150 per month from the Veterans' Administration as a result of a service-connected disability. Whether or not decedent properly reported his income to the appropriate tax authorities is not controlling. Failure properly to report his income was one factor which the jury could consider along with the other evidence in the case relevant on the issue of the pecuniary loss to the survivors. Likewise, the application to the Veterans' Administration was a matter for the jury to consider but was not conclusive. We are satisfied from our review of the evidence adduced that the jury verdict in the sum of $350,000 as damages for wrongful death is excessive. We would reduce the award to $200,000, a figure we arrive at on due consideration of the evidence in the case as to decedent's earnings and the support and care rendered and furnished to his family. We have also considered as appropriate elements of recovery for wrongful death damages the rights of the surviving spouse to recover a sum sufficient to provide some measure of compensation for the loss of services, society and companionship and for the children's deprivation of their father's care, guidance and training. Although defendants in their analysis of the jury's verdict point to the necessity of reducing the damage award to present value, defendants fail to take into account as an offsetting factor consideration of "present and ever upward spiraling cost of living" (Lucivero v Long Is. R. R. Co., 22 Misc 2d 674, 675; see, also, Neddo v State of New York, 194 Misc 379, affd 275 App Div 492, affd 300 NY 533; Countryman v Fonda, Johnstown & Gloversville R. R. Co., 166 NY 201).

Accordingly the judgment, Supreme Court, Bronx County (DAVID LEVY, J.), entered April 13, 1977, should be reversed,

on the law and on the facts, and the matter remanded for a new trial with costs to abide the event unless plaintiff stipulates to reduce the verdict to $200,000 as damages for wrongful death and $25,000 as damages for conscious pain and suffering, both damage awards to be apportioned on the basis of 80% against defendant doctors and 20% against defendant hospital, in which event the judgment, as so modified, should be affirmed, without costs.

SILVERMAN, J. P. (dissenting in part). I would reverse the judgment as to defendants doctors and order a new trial as to them on the issue of liability.

CPLR 4110-b provides: "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court, out of the hearing of the jury, shall inform counsel of its proposed action upon the requests *prior to their arguments to the jury,* but the court shall instruct the jury after the arguments are completed." (Emphasis added.)

In accordance with that statute, defendants doctors submitted written requests to charge, of which request No. 18 was a request to the effect that defendants are not liable for a mere error of judgment. This is of course the rule stated in the leading case of *Pike v Honsinger* (155 NY 201, 210). The Judge, before summations, stated that he would give the charge in substance. Plaintiff's attorney stated that he had no objection. The attorneys summed up to the jury. The Judge then charged the jury and did not say anything about errors of judgment. Defendants excepted to that failure. The court stated that he did not think the question of judgment was appropriate to this particular case.

Defendants' attorneys were explicitly told before the summation that something would be in the charge, and though the summation is not transcribed, defendants indicated that they made their argument based on that assumption and then, without notice, the Judge failed to give the charge. Defendants were thus deprived of the benefit of CPLR 4110-b, i.e., the right to be informed before summation as to what the Judge's ruling would be on their request to charge.

It may well be that after making the ruling under CPLR 4110-b, the Judge came to the conclusion that the instruction that he said he would give was erroneous. I do not say that in

such circumstances the Judge must give an erroneous instruction; but he must do something to give the parties the benefit of the statute, e.g., permit them to reopen summations, or, perhaps, order a mistrial. What I think he cannot do is what the Judge did in this case—simply make no effort to remedy the prejudice to the parties.

In fact I am inclined to the view that it was error for the court not to give the charge on error of judgment. The doctors here apparently made deliberate decisions not to perform a tracheotomy, and to put the patient in a private room with certain equipment and safeguards rather than in an intensive care unit. These may have constituted wrong medical treatment. But the doctors were entitled to have submitted to the jury the question whether this treatment, even assuming it to be wrong, constituted a "want of ordinary and reasonable care" or, on the other hand, "a mere error of judgment" in which the doctors did "what he thinks is best after careful examination." *(Pike v Honsinger, supra,* p 210.) And the Judge should have charged the jury on that dichotomy.

LANE and SULLIVAN, JJ., concur with FEIN, J.; SANDLER, J., concurs in result only; SILVERMAN, J. P., dissents in part in an opinion.

Judgment, Supreme Court, Bronx County, entered on April 13, 1977, reversed, on the law and on the facts, and the matter remanded for a new trial, with $60 costs and disbursements of this appeal to abide the event, unless plaintiff, within 20 days after service by appellants upon plaintiff of a copy of the order of this court, with notice of entry thereof, stipulates to reduce the verdict to $200,000 as damages for wrongful death and $25,000 as damages for conscious pain and suffering, both damage awards to be apportioned on the basis of 80% against defendant doctors and 20% against defendant hospital, in which event the judgment, as so modified, is affirmed, without costs and without disbursements.