Brigid DULLARD, as Administratrix of the Estate of Hugh Dullard, Deceased, Plaintiff-Appellee,

v.

The BERKELEY ASSOCIATES COMPANY and Murray Hill Properties, Inc., 35 East 35th Street Corp., 175 West 12th Street Company, Beatay Holding Corporation, Bernmark Company, Skillman Avenue Construction Corporation, Lynn Realty Corporation, Broadway Construction Corporation, The Cousins Company, Stephen Perlbinder, Barton Mark Perlbinder, Bernard West, William West, Martin Berger, Bruce Berger, Michael Berger, Julius Perlbinder, Milton West, Lillian West, Augusta Berger Danzig, and 400 Concrete Corp. and Perlbinder Realty Corp., individually and as a joint venture, Defendants and Third-Party Plaintiffs-Appellants-Appellees,

v.

CASTLE CONCRETE CORP., Third-Party Defendant-Appellant-Appellee.

Nos. 731–734, Dockets 78–7457, 78–7512, 78–7560 and 78–7561.

United States Court of Appeals, Second Circuit.

Argued April 11, 1979.

Decided Aug. 27, 1979.

John J. Wrenn, Larkin, Wrenn & Cumisky, New York City, for Berkeley Associates (defendants and third-party plaintiffs-appellants-appellees other than 400 Concrete Corporation).

Michael E. Shay, Langan & Levy, New York City, for defendant 400 Concrete Corp.

Mark J. Aaronson, Bower & Gardner, New York City, for third-party defendant-appellant Castle Concrete Corp.

Arthur N. Seiff, O'Dwyer & Bernstien, New York City (Frank Durkan, O'Dwyer & Bernstien, New York City, of counsel), for plaintiff-appellee.

Before OAKES, Circuit Judge, and PIERCE * and WERKER,* District Judges.

OAKES, Circuit Judge:

This is an appeal in a wrongful death diversity action from a judgment of the United States District Court for the Southern District of New York, Kevin T. Duffy, Judge, entered after a jury trial on October 3, 1978, and amended on October 10, 1978. The jury awarded plaintiff $630,000 for the wrongful death of her decedent, a construction foreman struck in the head by a falling "4 × 4" timber; $20,000 for his conscious pain and suffering; and $3,825.30 for funeral and hospital expenses, for a total judgment (including prejudgment interest) of $803,546.81. In a special verdict, the jury fixed the proportionate liability of the parties as follows: 39% with respect to the defendants and third-party plaintiffs. The Berkeley Associates Company and its various partners (hereinafter "Berkeley"), the owner and general contractor; 35% with respect to the defendant 400 Concrete Corporation ("400 Concrete"), which had contracted with Berkeley to perform the concrete superstructure work; and 26% with respect to the third-party defendant Castle Concrete Corporation ("Castle"), which had contracted with 400 Concrete to perform the work that 400 Concrete had agreed to perform for Berkeley. The court granted 400 Concrete's claim against Castle for indemnity of its 35% share of liability but denied both Berkeley's claim against Castle for contractual indemnity of Berkeley's 39% share and 400 Concrete's claim against Castle for indemnity of 400 Concrete's liability to indemnify Berkeley. For the reasons that follow, we are unpersuaded by the several arguments raised on appeal except for the objection that the verdict was excessive.

Decedent, a labor foreman employed by Castle, was working on East 53rd Street adjoining the construction site for a high-rise building at the time of his death. Material for the construction was stored at several locations on that street and elsewhere, and appellants used a large crane to lift the material to the upper floors of the

* Lawrence W. Pierce and Henry F. Werker of the Southern District of New York, sitting by designation.

building under construction. Decedent was struck and killed by a piece of lumber (4″ × 4″ × 4′) that fell from an undetermined source at least ten stories above ground level. At the time of the accident Castle had stacked wood on the 29th and 31st floors, and there was some testimony that the piece of lumber fell from one of those floors. The appellants had not provided any overhead protection, or more specifically a sidewalk shed, in violation of the New York Labor law,[1] nor did they have any effective system to warn endangered workers of falling objects.

■ Berkeley's argument that there is no diversity of jurisdiction is frivolous. When plaintiff commenced this suit, she was a citizen of Ireland. Defendants are citizens of the United States. *See* 28 U.S.C. § 1332(a)(2).

■ Castle and Berkeley maintain that the court incorrectly charged the jury that certain provisions of the New York Labor Law, *see* note 1 *supra*, impose on the owner and general contractor the continuing duty to provide suitable overhead protection, as well as the nondelegable duty to provide reasonable safety to workers on the construction site. According to defendants, the position of the crane made it impossible to provide overhead protection and thus under New York law, *Ortiz v. Uhl*, 39 A.D.2d 143, 148, 332 N.Y.S.2d 583, 588 (1972), *aff'd*, 33 N.Y.2d 989, 353 N.Y.S.2d 962, 309 N.E.2d 425 (1974), they owed no such duty here. After reviewing the evidence, especially the photographic exhibits, we are persuaded that the defendants' proof of the impossibility of operating the crane if overhead protection were offered was so meager and dubious that the court was amply justified in declining to charge the jury that impossibility was a defense. *Ortiz* involved work at the foot of a New York State Power Authority dam, with "no practical way of providing overhead protection" over the entire surface of the gorge.

39 A.D.2d at 145, 332 N.Y.S.2d at 585. Here involved was work on a high-rise building with a limited work area where such protection could readily have been provided in the form of a sidewalk shed as set forth in the New York Board of Standards and Appeals' Industrial Code (Rule 23), without interference with the operation of the crane.

■ Castle also argues that plaintiff failed to establish a prima facie case of negligence against 400 Concrete.[2] But the jury could have found that Barton Mark Perlbinder, an officer of 400 Concrete who in that capacity had signed the contract with Castle, was on the job site almost daily, including the morning of the accident; and that another officer was also on the job site during the months of the construction. Castle points out that these officers claimed to be on the site in their capacity as officers of *Berkeley*. But the jury might have disagreed in light of Perlbinder's signing of the Castle contract. Moreover, regardless of the degree of 400 Concrete's actual control and direction of Castle's work, it would appear that 400 Concrete, as a contractor, had a nondelegable duty to insure that its construction area was so "guarded . . . as to provide reasonable and adequate protection and safety to the persons employed therein," N.Y.Lab.Law § 241(6) (McKinney Cum. Supp.1978); *see Allen v. Cloutier Construction Corp.*, 44 N.Y.2d 290, 405 N.Y.S.2d 630, 376 N.E.2d 1276 (1978). The jury certainly might have found that 400 Concrete failed to provide adequate protection.

■ Appellants complain that the court erred in giving the jury a res ipsa loquitur instruction. All that the court did was to charge the jury that the law "permits but does not require" an inference of negligence against the person having exclusive control of an instrumentality that causes an accident if the accident would not ordinarily have occurred without negli-

---

1. N.Y.Lab.Law §§ 2(3), 200(1), & 241(6) (McKinney Cum.Supp.1978); N.Y. Board of Standards & Appeals' Industrial Code, Rules 23–1.3, –1.5(a), –1.7(a), & –1.18.

2. Castle makes this argument by virtue of its duty to indemnify 400 Concrete, as to which see *infra*; the latter does not dispute its liability here, its insurer apparently preferring to seek indemnity over against Castle.

gence. This is a simple enough principle of circumstantial evidence and has none of the vice of creating a presumption of negligence that the mere incantation of the Latin phrase so often evokes (although in certain special relationships, e. g., carrier/passenger, it is proper to shift the burden as a matter of policy, see W. Prosser, *Handbook of the Law of Torts* § 40 at 231 (4th ed. 1971)). One would suppose that a timber falling on a person's head from a high building was the quintessential "thing," at least it was in Baron Pollock's mind when he dropped the phrase onto the confused heads of the legal world in the argument in *Byrne v. Boadle,* 2 H. & C. 722, 159 Eng.Rep. 299 (1863) (barrel of flour rolling out of window). After noting that Castle and 400 Concrete each contended that it was not in exclusive control of the instrumentality, the court instructed the jury that this was a question of fact. The court noted that as general contractor and owner, Berkeley was "in control of everything at the job site," and continued that the question then was whether Berkeley had exclusive control of the instrumentality.

■ Under New York law, these instructions were more than adequate, even overly generous to defendants, for New York permits a "thing to speak for itself" as a matter of inference even when plaintiff has not shown that the instrument was in the defendant's *exclusive* control; the inference may be equally applicable to several persons if "they shared a common duty and there was no indication that any one of them in particular had actually caused the injury." *De Witt Properties, Inc. v. City of New York,* 44 N.Y.2d 417, 427, 406 N.Y.S.2d 16, 21, 377 N.E.2d 461, 466 (1978); *see also* Restatement (Second) of Torts § 328D, comment g (1965). Here there was evidence (some of which we have already recounted) that Castle, 400 Concrete, and Berkeley "shared a common duty" to keep the workplace safe, and the court was justified in submitting a permissive inference charge to the jury. Although Berkeley complains of the court's language "in control of every-

thing," the court then stated that the jury must find that Berkeley exercised *exclusive* control over the instrumentality. Reviewing the charge as a whole, we believe that the court fairly stated the law.

■ Castle's agreement to indemnify 400 Concrete was for "any and all claims, losses, suits, damages, judgments, expenses, costs and charges of every nature and kind, both legal and otherwise, whether direct or indirect, by reason of personal injuries, death or property damage to any persons or others caused by, arising out of or occurring in connection with the work provided under the terms of this contract," even if the "claims, suits, damages and judgments for personal injuries, death or property damage . . . be due to the active negligence or statutory liability" of 400 Concrete. 400 Concrete argues that this obliges Castle to indemnify 400 Concrete not only for the latter's own *tort* liability, but also for its *contractual* liability to indemnify a third party, Berkeley, for Berkeley's tort liability to plaintiff. We disagree. As the district court found, the plain terms of the contract indicate that Castle is liable to indemnify only for 400 Concrete's tort liability to third parties. If the parties had intended that this typically worded hold harmless agreement have the unusual legal effect of including 400 Concrete's *contractual* liability to indemnify a third party, one would suppose that specific language would have been inserted to manifest that intent clearly. *See Compagnie Nationale Air France v. Port of New York Authority,* 427 F.2d 951, 954 (2d Cir. 1970) (unnamed third party); *Ratigan v. New York Central Railroad,* 181 F.Supp. 228, 233–34 (N.D.N.Y.1960), *aff'd,* 291 F.2d 548, 555–56 (2d Cir.), *cert. denied,* 368 U.S. 891, 82 S.Ct. 144, 7 L.Ed.2d 89 (1961) (same).

■ Castle and Berkeley complain that the jury award of $20,000 for conscious pain and suffering was not supportable in the record. We cannot agree. There *was* evidence that plaintiff's decedent was partly conscious before his death. A police officer on the scene testified that when he saw decedent a few minutes after the accident,

decedent "was still alive, he was breathing, and his arms were moving to a limited degree. He was just about unconscious."

We do agree with appellants, however, that the $630,000 jury verdict for wrongful death was excessive under New York law. In determining whether an award is excessive under that law, a federal court may not consider the amount of the prejudgment interest, in this case an additional $148,817.90, see Zaninovich v. American Airlines, Inc., 26 A.D.2d 155, 160, 271 N.Y.S.2d 866, 872 (1966). But the principal of $630,000 alone, if invested to yield a 7% annual income (a yield that may underestimate what plaintiff can obtain in the contemporary market[3]), would provide the next of kin with an annual income of $44,100, without exhausting any principal. By contrast, the income provided by decedent at the time of his death in support of his family was approximately $15,704, consisting of weekly support of $302, computed by subtracting $40 personally used by the decedent from his $300 in take-home pay plus $42 in "stamps," received under the terms of his union's contract. Given his working life expectancy of twenty-seven years, that would mean total support of approximately $424,008 which, if discounted at the same 7% rate to reflect its present value, would amount to approximately $188,250.[4]

This figure does not, of course, take into account decedent's overtime pay or future earning potential, or the family's loss of decedent's services, society, and parental guidance, see Spadaccini v. Dolan, 63 A.D.2d 110, 124, 407 N.Y.S.2d 840, 848 (1978). But the only testimony with respect to the first two elements was Mrs. Dullard's statement that her husband earned occasional overtime; even as to that there was no estimate as to the amount. With respect to loss of services and guidance, although we recognize that this is not only a legitimate element of damages in New York but an important one, we do not believe that it justifies more than tripling either the annual income to the survivors or the total award for loss of pecuniary support. Our survey of New York law reveals that many courts have permitted awards in excess of direct pecuniary loss to compensate for lost services and guidance, but not to the degree here. See, e. g., Zaninovich, supra (reducing jury verdict to $475,000, an amount yielding an annual amortized return of approximately $39,000, where direct pecuniary loss was probably no more than $20,000 per annum); Lucivero v. Long Island Railroad, 22 Misc.2d 674, 200 N.Y.S.2d 728 (Sup.Ct. 1960) (establishing award of $175,000 where direct pecuniary loss, assuming a working life expectancy of thirty-two years, was perhaps $166,400).[5] Moreover, it can be ar-

3. The June 25, 1979, edition of the Wall Street Journal at 40, cols. 3 & 4, sets forth the savings yields on a variety of investments. In general, investments in the principal amount of at least $1,000 can earn over 9% interest, e. g., Treasury Notes (9%–9.4%); High Grade Corporate Bond Funds (7.9%–9.6%); Six Month Bank Certificates (8.873%–9% on minimum amount of $10,000). More speculative forms of investment, of course, may earn even higher yields.

4. This amount was derived by applying the discount factor $1/(1 + i)^n$ to the annuity of $15,704, where n = the year for which present value of income is sought and i = the interest rate. The discounted annuity for the first year is therefore $15,704 \times (1/1.07)$ or $14,677, for the second year $15,704 \times 1/(1.07)^2$ or $13,716, and so forth. The sum of the 27 yearly amounts, so derived, is approximately $188,250, the present value of $424,008. This method of discounting allows plaintiff to recover an amount approximately equivalent to the amount of salary that decedent would have contributed to his family over the course of his

work life had he lived. It is not precisely equivalent because decedent was paid in weekly and not yearly installments. It also assumes that all taxes were paid prior to the contribution to the family.

5. We note in passing that New York apparently does not require the reduction of a wrongful death award by the amount of the decedent's expected tax liability, see Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308 (2d Cir. 1964). (Although Zaninovich v. American Airlines, Inc., 26 A.D.2d 155, 160, 271 N.Y.S.2d 866, 872 (1966), refers to income tax liability, it is unclear whether the case squarely holds that such liability is to be considered in establishing an award.) Nevertheless, the plaintiff in this case introduced evidence only as to decedent's take-home pay, not his gross income. It would be inappropriate for us to inflate the net earnings figures set forth in the text on the basis of total speculation.

Although we probably cannot consider the costs of litigation, including attorneys' fees, in passing on the excessiveness of the verdict,

gued that the comparison of $44,100 (7% × $630,000) to $15,704 actual support may be unduly generous to plaintiff. First, it ignores the probability that decedent's children (aged ten, eleven, and twelve at the time of the accident) will presumably need little or no support once they complete their educations. Second, it fails to discount the $630,000 award to present value. *See Zaninovich, supra,* 26 A.D.2d at 161, 271 N.Y. S.2d at 873.

Plaintiff argues on appeal that a wrongful death award may be adjusted upward to reflect the probable effect of future inflation. New York law on this issue is not as clear as she supposes, however, *compare Theobald v. Grey Public Relations, Inc.,* 39 A.D.2d 902, 334 N.Y.S.2d 281 (1972) (per curiam), *and Zaninovich, supra,* 26 A.D.2d at 160, 271 N.Y.S.2d at 872, *with Spadaccini, supra,* 63 A.D.2d at 124, 407 N.Y.S.2d at 848, *and Theobald, supra* (McGivern, J., dissenting). New York law is evidently as much in a "stage of uncertainty and flux," *Feldman v. Allegheny Airlines, Inc.,* 524 F.2d 384, 390 (2d Cir. 1975) (Friendly, J., concurring), as state and federal decisions are generally on the subject of inflation in the law of damages. And in the absence of any expert testimony at trial on the issue, *compare Feldman v. Allegheny Airlines, Inc.,* 382 F.Supp. 1271 (D.Conn.1974), *aff'd in part and rev'd in part,* 524 F.2d 384 (2d Cir. 1975), we are even more reluctant to make such an adjustment. Assuming, however, that some adjustment is permissible, we would still find the verdict here excessive. True, if we adopt Judge Blumenfeld's technique (in *Feldman, supra,* 524 F.2d at 387–88) of reducing the discount rate by an inflationary factor, then on one basis the net discount rate might be at this time of "double-digit" inflation zero or even a negative computation. On the other hand, this is terribly speculative and a more reasoned approach might be to follow *Feldman* and base the future discount rate upon an aver-age of past discount rates, resulting in a net rate of approximately 1.5%. Given a total contribution of $424,008 (computed *supra* note 4), that rate would justify an award of approximately $346,550. The difference between the actual award of $630,000 and this amount is too large to be justified by loss of services and guidance, or any other legitimate element of damages.

■ With all these considerations in mind, we conclude that the judgment should not exceed $500,000 with appropriate interest. Although we acknowledge that the measure of damages is a complex factual determination involving a considerable measure of estimation which is largely entrusted to the jury's good sense, *Bellows v. Smith,* 50 A.D.2d 622, 375 N.Y.S.2d 43 (1975), we are convinced that the present verdict was clearly excessive.

Accordingly, we reverse the judgment of the district court and order a new trial solely on the issue of damages; but we will withhold entry of judgment for thirty days, within which time plaintiff-appellee may, if she chooses, file with the clerk of the district court a remittitur of all damages in excess of $500,000 (plus interest from the date of the accident). Plaintiff-appellee shall then file in the office of the clerk of this court a certified copy of the remittitur filed in the district court. If plaintiff-appellee files a remittitur, the judgment of the district court, less the amount remitted, will be affirmed; otherwise, as stated, the judgment will be reversed and a new trial solely on the issue of damages ordered. *See Joiner Systems, Inc. v. AVM Corp.,* 517 F.2d 45, 49 (3d Cir. 1975); *cf. Dimick v. Schiedt,* 293 U.S. 474, 482–83, 484–85, 55 S.Ct. 296, 79 L.Ed. 603 (1935); *Grunenthal v. Long Island Rail Road Co.,* 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968) (both cases recognize practice of remittitur or conditional new trial in federal courts).

Judgment in accordance with opinion.

---

*Zaninovich, supra,* 26 A.D.2d at 160, 271 N.Y. S.2d at 872, however unrealistic that may be, *Theobald v. Grey Public Relations, Inc.,* 39 A.D.2d 902, 903, 334 N.Y.S.2d 281, 283 (McGivern, J., dissenting), we note that in a wrongful death suit contingent fees of as much as one-third of the net recovery (after deducting expenses) are presumptively permissible, N.Y. Court Rules § 603.7(e)(2) (1978); *Gair v. Peck,* 6 N.Y.2d 97, 188 N.Y.S.2d 491, 160 N.E.2d 43 (1959), *appeal dismissed, cert. denied,* 361 U.S. 374, 80 S.Ct. 401, 4 L.Ed.2d 380 (1960).