Peggy **SHELL, for herself Individually and as Administratrix of the Estate of Bevo Mac Shell, Deceased, Tracy Shell, and Anthony Shell, both being Infants under the age of 14 years, by Peggy Shell, their Mother and Natural Guardian, and Shell's Bar and Restaurant Corp., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Frank J. VASSALLO, as Administrator of the Estate of Dominick Vassallo, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Lucille ALLEVA, as Administratrix of the Estate of Frank Romanelli, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Nos. 77 C 1991, 77 C 2111 and 78 C 1582.**

United States District Court, E. D. New York.

Jan. 26, 1982.

Harvey L. Strelzin, New York City, and Julius J. Cardile, for plaintiffs.

Edward R. Korman, U.S. Atty., E.D.N.Y. by Rodger C. Field, Asst. U.S. Atty., Brooklyn, N.Y., for defendants.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

*Shell Action*

Plaintiff commenced this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, on her own behalf and that of her infant children to recover for the wrongful death of her husband and their father, and for loss of property, due to the alleged negligence of the Department of the Navy, an agency of the defendant. The corporate plaintiff also sues for destruction of its business and property. The action was fully tried before Judge Dooling of this Court but his subsequent death occurred before a decision was reached. The case was thereafter reassigned to the writer, who has reviewed the transcript of the trial and the exhibits in evidence and studied the briefs of the parties. This memorandum constitutes the Court's findings of fact and

conclusions of law pursuant to Rule 52(b), F.R.Civ.P.[1]

The tragic event which gave rise to plaintiff's claims occurred on the morning of February 4, 1976. At approximately 7:20 A.M. a substantial portion of a huge brick wall suddenly collapsed, causing extensive damage to adjacent buildings and the death of Bevo Mac Shell, plaintiff's husband and father of the infant plaintiffs. Mr. Shell was the owner and operator of a bar and restaurant located in the most heavily damaged building at 85 Hudson Avenue and sustained fatal injuries in its ensuing collapse.

The wall in question was located on the perimeter of the former Naval Shipyard in Brooklyn, New York. As nearly as can be determined, it was erected between 1805 and 1830 and thus was about 150 years old at the time of its collapse. The wall ran between Hudson Avenue and Evans Street, a distance of some 400 feet. It was 20 to 25 feet in height, four feet wide at the base and tapered to a width of 16 inches at the top. The collapsed portion was a crescent-shaped segment of the top eight feet of the wall's midsection for a distance of approximately 145 feet, directly adjacent to the buildings for which plaintiffs have brought suit.

## Liability

■ Defendant concedes that New York law governs this case, 28 U.S.C. § 1346(b), and that if plaintiffs may rely upon the doctrine of *res ipsa loquitur*, a *prima facie* case of negligence has been established, which requires the government to come forward with evidence sufficient to rebut the inference of negligence. *George Foltis, Inc. v. City of New York*, 287 N.Y. 108, 118, 38 N.E.2d 455 (1941). On the facts here, the *res ipsa loquitur* rule is clearly applicable since it is undisputed that the wall was entirely on government property and exclusively within the defendant's control. And defendant also concedes that it was charged

with the duty of exercising reasonable care in the inspection of the wall in order to ascertain the existence of defects which might require repair.

Defendant's evidence established that it performed its duty of inspection only on the side of the wall which faced the Naval Shipyard. Lt. Gilbert Dalit, the investigative officer assigned to report on the collapse of the wall, testified that four or five prior inspection tours he made on the side adjacent to the private property were limited to the first 30 feet at the Evans Street end and the last 15 feet at the Hudson Avenue end. Thus it appears that some 350 feet of the wall remained uninspected. Moreover, there was no record of any repairs to the wall or of any stress tests or other examination of the condition of bricks and mortar. Defendant's own expert, Milton Greenstein, former Director of the Engineering Section at the Naval Shipyard, stressed the importance of visual inspection and periodic repointing of brick structures and conceded that with extensive maintenance, the wall would not have fallen. Lt. Dalit's report indicates that maintenance work was performed only on the Navy side—a clear admission that similar maintenance probably would have been required on the other side.

Walls do not, in common experience, fall down absent negligence on the part of those charged with maintaining them. On the evidence as a whole, I find that the defendant did not exercise reasonable care in the maintenance of the wall and was, therefore, negligent and liable to the respective plaintiffs for those injuries and/or damages that were a proximate result of the wall's collapse.

## Damages

### Shell Claims

■ The Shell plaintiffs seeks monetary damages for the wrongful death of their decedent, Bevo Mac Shell, and for the value of his property destroyed in the collapse of

1. Although the captioned actions were not formally consolidated, this decision includes all claims in each action.

the wall. Damages for wrongful death are limited by statute to the "fair and just compensation for the pecuniary injuries resulting from the decedent's death to persons for whose benefit the action is brought." N.Y. Estates, Powers and Trusts Law, § 5–4.3 (McKinney 1967).

Decedent was about 30 years old at the time of his death on February 4, 1976. He married plaintiff Peggy Shell in 1965 and had two children, Tracy born in 1967 and Anthony born in 1968. At the time of his marriage, decedent was employed as a packer by McNally Brothers, Inc., a company engaged in moving household goods, and was considered a reliable employee. According to McNally records, decedent earned $8,774.56 in 1969, $10,131.49 in 1970 and $5,638.95 in 1971, prior to leaving to open his own bar and grill business at 85 Hudson Avenue in Brooklyn. Since all decedent's business records were destroyed in the collapse of his premises, Mrs. Shell was compelled to estimate decedent's contribution to the support of the family unit, to which she also contributed from her own employment at Maimonides Hospital Center since 1971. Decedent's contribution at the time of his death was calculated to be approximately $1,285.00 per month or a total of $15,420 per year.

Before considering the question of a "fair and just compensation" to plaintiffs in these circumstances, brief comment is required concerning defendant's general contentions. The Court finds no merit in the claim that plaintiffs were receiving no pecuniary benefits from decedent and had no likelihood of receiving any in the future. The Court rejects defendant's suggestions that decedent had separated from his family and was not contributing to their support, finding them largely based upon surmise and hearsay not entitled to credence. All of the direct testimony regarding the family relationship between decedent and his wife and children completely contradicts such contentions and is accepted as more likely the fact than not. Moreover, the issue is not how little or how much time the decedent spent with his wife and children, but whether his death resulted in a pecuniary loss to them. As pointed out in *Freeman v. Corbin Avenue Bus Co.*, 401 N.Y. S.2d 224, 226, 60 A.D.2d 824, 826 (1st Dep't 1978), *leave to appeal denied*, 44 N.Y.2d 649, 408 N.Y.S.2d 1023, 380 N.E.2d 336 (1978),

> "Nothing their mother or father did could deprive them [the children] of the right to support from the father, difficult as that might be to enforce. . . . [T]he children were entitled to some recovery consistent with the realities of their father's economic and physical condition, his attitude toward them, and of course the number of years left before they would reach majority."

Here, the difficulty in establishing the reality of the decedent's "economic and physical condition" arises primarily because of the total destruction of evidentiary facts and business records as a result of defendant's own negligence. Surely it would not be "fair and just" to permit defendant to diminish its liability because of its own wrong. Indeed, the government itself, in its role of tax collector, has found it not arbitrary, in the absence of records, to reconstruct a person's income on the basis of the normal cost of supporting a family of the taxpayer's size in the locality where he lived according to data supplied by the Bureau of Labor Statistics. See *Giddio v. Commissioner of Internal Revenue*, 54 T.C. 1530, 1532 (1970). In this case, those statistics show that in 1976 a family of four including two young children, living in a metropolitan area on an intermediate budget—the situation here—would require an income of $16,596.00 to cover the cost of food, housing, transportation, · clothing, medical care and other family consumption and costs, as well as Social Security and disability insurance payments and personal income taxes. See *Statistical Abstract of the United States, 100th Ed.* at 487 (hereinafter "*Statistical Abstract*"). Mrs. Shell's estimate of the decedent's contribution to family living expenses, namely $15,420, was fairly within the statistical estimate and is accepted as a reasonable basis for determining the economic loss sustained by plaintiffs.

As the next step, a determination must be made as to the probability that decedent would have continued to support his family in the future. All indications are that he was in good health and was regarded by his former employer as a bright and excellent worker. According to defendant's economic expert, the decedent had a work-life expectancy of 32.3 years. This is a more conservative estimate and is accepted in preference to the 37.4 years of full life expectancy utilized by plaintiffs' expert. Projecting over the 32.3 years period, the decedent on a $15,420 per annum basis would have contributed to family support a total of $498,066.

That figure, however, would have to be reduced by the decedent's personal consumption as a family member. The parties' experts made varying calculations on assumed expenditures, which the Court finds unrealistic in terms of everyday life and the nature of the decedent's occupation as a bar and grill owner. Obviously, mortgage payments on the family home remain the same regardless of how many occupants reside in it. The same is largely true with respect to the costs of heating and utilities, household furnishings and supplies, and insurance coverage. Ordinarily, a wage earner would account for a substantial portion of the family food bill. Here it was estimated to run between $3480 and $4200 annually, which compares favorably with the applicable food budget figure of $4,160 for a family of this size in 1976. *Statistical Abstract, supra,* at 487.

But there is a difference in this case. Decedent, as a bar and grill owner, frequently had meals at his place of business and, therefore, his consumption of food at home would be considerably less. Based upon the evidence as to monthly expenditures for food at home, meals in restaurants, clothing, recreation and entertainment, automobile expense, and miscellaneous items, a fair figure for decedent's consumption would not exceed $3,300 annually. Projecting that figure over decedent's expected work-life of 32.3 years would result in an overall consumption of $106,590. Subtracting that amount from the previous total family support figure of $498,066 reduces that sum to $391,476, as the estimated net pecuniary loss sustained by plaintiffs due to decedent's death. That figure, of course, makes no allowance for any change in decedent's business income, or the family's cost of living despite the recognized effects of inflation since his death.

An award of damages in a case like this cannot be based upon any real certainty. The decedent was struck down in the prime of life and thus it is not unreasonable to expect that he may have continued to earn a livelihood for himself and his family for some years to come. His normal work-life expectancy is the only measure available. As already indicated, the defendant is in no position to complain that evidence of the decedent's earnings is not supported by business records. Based upon the evidence adduced and the statistical corroboration supplied by the defendant's own publication, the Court finds that fair and just compensation to plaintiffs for the wrongful death of decedent is the sum of $400,000, which includes an award of $25,000 to each of decedent's sons as compensation for the loss of parental guidance. The Court recognizes that the award will be substantially decreased by the customary contingent attorney's fee and reimbursement for expenses. See *Dullard v. Berkeley Associates Company,* 606 F.2d 890, 895 n.5 (2d Cir. 1979).

One other claim remains, that of decedent's corporation, plaintiff Shell's Bar & Restaurant Corp. There is no question that the collapse of defendants' wall totally and irreparably destroyed all of the furniture, fixtures, and stock in trade of the bar and grill business. Decedent purchased the goodwill, furnishings and stock in trade in June 1971 for the sum of $14,000, of which $1,000 was attributable to the value of fixtures and equipment. The purchase price was to be paid through a series of 60 promissory notes, and the premises were occupied pursuant to a 10-year lease and sublease at a $250 monthly rental. It appears that decedent invested $5,000 in the business, which he had borrowed; that he later

installed a pool table in the premises; that the premises were in great disrepair; and that there were outstanding judgments against the corporation totaling some $10,000, and many other claims of taxing authorities.

The defendant of necessity concedes that the corporate plaintiff was put out of business by the events which gave rise to this litigation. Appraisal experts of the parties differed substantially as to the value destroyed and the method of evaluation. Plaintiffs' appraiser, assuming that the business produced annual earnings of $15,500, opined that its value was two and one-half times that figure, *i.e.*, $38,750. Defendant's expert viewed the assumed $15,500 income as salary or business expense, reducing earnings to zero and rendering the business valueless for an investor. Defendant also argues that plaintiff has not shown that the corporation had any value. The corporation, however, was not destroyed, although its property was. Obviously, fixtures, equipment and stock in trade having some value were demolished. The decedent did invest $5,000 in the business and added a pool table; and the corporation was obligated to pay $14,000 to the seller over a period of five years. If payment was not made, as the government seems to suggest, it is still a claim against the corporation; the destruction of the business would not extinguish the debt. Under the circumstances, since destruction of business records was the result of the defendant's negligence, it cannot complain if valuation of the destroyed business is not exact. The Court finds and concludes that Shell's Bar & Restaurant Corp. is entitled to a separate award of $20,000 for the loss of its business and property.

*Alleva Action*

■ Plaintiff in this action is the administratrix of the estate of Frank Romanelli, deceased, who owned the building at 85 Hudson Avenue in which Shell's bar and grill business was located. She sues to recover for physical damage to the premises caused by the collapse of the Navy Yard wall, and also claims damages for the loss of rental revenue cut off by the destruction of Shell's business. As noted above, Shell's ten-year lease of the ground floor of the building provided for payment of monthly rent of $250 and had five years and four months to run at the time of the disaster.

The parties agree that the same evidence which establishes liability in the *Shell* case does so in this case. The sole remaining issue is one of damages.

Although plaintiff offered expert evidence to establish that the real property (land and building) had a market value of $26,000 prior to the disaster, that is obviously not an appropriate measure of damages. The evidence is uncontradicted that only a first floor extension of the building was destroyed; there was no damage to the main portion. Moreover, the market value alluded to above included the value of the land. The proper measure of damages in this situation is the cost of repairing the damaged portion of the building and the loss of rental income due to loss of occupancy during the period of time needed to perform the repairs. See *Slavin v. State of New York*, 152 N.Y. 45, 46 N.E. 321 (1897).

The parties' experts did not appear to be very far apart on the cost of restoring the building to its former condition. In response to Judge Dooling's questioning, plaintiff's real estate expert estimated that it would cost $15,000 to $16,000 to restore the building to its former condition. Defendant's expert, a staff appraiser attached to the Naval Facilities Engineering Command, based his cost of restoration partially on a $4,000 estimate for the installation of a new boiler and piping plus a cost of $5,600 to reconstruct the open rear wall of the original building, a total of $9,600. He did not take into account, however, that this made no provision for rebuilding the ground floor extension, which formed part of the premises occupied by Shell's bar and grill. Photographs in evidence show that the destroyed extension occupied the entire backyard at the rear of the original building and was built of brick. Reconstruction of the extension, based on defendant's expert's cost of a single brick wall, would

surely increase the cost to at least $15,000, if not more. Accordingly, the Court finds and concludes that a fair and reasonable award for repair of the damage to plaintiff's building would be $15,000. Under New York law, as previously noted, the measure of damages would ordinarily include the loss of rental during the time reasonably required to restore the premises to occupiable condition. *Slavin v. State, supra;* 10 N.Y. Damages Law § 963 (1965). No evidence was offered to support such an award, however, and it appears that the building was boarded up and remained vacant. This would support an inference that the lease with Shell's Bar & Restaurant Corp. was abandoned. The damage award to Alleva is therefore limited to $15,000.

*Vassallo Action*

■ The named plaintiff in this action sues as administrator of the estate of Dominick Vassallo, deceased, who allegedly owned the building at 81 Hudson Avenue, also claimed to have been damaged by the collapse of the Navy Yard wall. At trial, however, it developed that Frank Romanelli, also deceased, may have owned the building, and at Judge Dooling's suggestion his executrix, Lucille Alleva, was added as a party plaintiff in order to protect the government from being sued twice.

The evidence discloses that within a few days of the disaster, the New York City Department of Buildings issued an order for emergency demolition of the building at 81 Hudson Avenue because of "imminent danger of collapse." Pl.Exh. 13. Plaintiff contends that the demolition was brought about by the collapse of the Navy Yard wall. Principal reliance is placed upon a letter dated December 21, 1976, from Borough Superintendent Philip E. Olin to Captain R. E. Pray, Commanding Officer at the Navy Yard. The letter recites:

> "The 'unsafe' building violation was issued as a result of *both the collapse of the wall* and an inspection which disclosed other deteriorating structural conditions existing in various locations of the building." Pl.Exh. 13 (emphasis supplied).

The letter also noted that "[t]here were no violations of record for these premises prior to notification of the collapse of the building wall." The "notification" mentioned in the letter referred to an earlier letter dated February 5, 1976, from the Department of Buildings to the Navy Yard concerning the collapse of the latter's wall. Pl.Exh. 13.

Defendant challenges both the admissibility and the probative value of the Olin letter, pointing out that 81 Hudson Avenue had been vacant for some time, its windows and doors were sealed, and it was in imminent danger of collapse because of the bulging and cracking of its exterior walls, including a masonry wall at the front first story. Pl.Exh. 13, "Notice of Unsafe Building and Structure Order." In addition, defendant points out that none of the bricks from the Navy wall fell upon plaintiff's building or backyard so as to cause any damage. Photographs in evidence, Pl.Exh. 149, support defendant's contention, for they show that the rear wall of 81 Hudson appears to be at least 40 feet distant from the Navy wall. Moreover, a deed in evidence establishes that the structure had no backyard, since it fully occupied its lot of 21 feet by 50 feet. The yard space behind 81 Hudson is actually part of the backyard of the neighboring building at 79 Hudson Avenue.

Recognizing that there was no physical contact between the collapsing Navy wall and the 81 Hudson premises, plaintiff advances the suggested inference that "shockwaves" generated by the collapse were responsible for the conditions which rendered the building unsafe and required its immediate demolition. No proof was offered to support such a theory and the Court may not indulge in speculation, conjecture or surmise in finding the facts. Nor does the statement in the Olin letter, *supra,* fill the void even when accepted at face value. That letter and related documents in Pl. Exh. 13 clearly establish that plaintiff's building was demolished by independent action of City authorities pursuant to local law, and not *because of* defendant's negligence in maintaining the wall which collapsed. That the City officials were

prompted to inspect 81 Hudson as a result of the collapse of the Navy wall does not warrant a finding or conclusion that defendant was contributorily responsible for their independent decision to demolish the building.

Accordingly, the Court finds and concludes that the destruction of plaintiff's premises at 81 Hudson Avenue was not caused by any negligence on the part of defendant and plaintiff's claim for damages must be denied.

The Clerk will enter separate judgments in conformity herewith and mail copies of this decision to the attorneys for the respective parties.

SO ORDERED.

### SUPPLEMENTAL ORDER

Pursuant to 28 U.S.C. § 2674 (1976), the judgment which the Court's Memorandum of Decision and Order dated January 26, 1982, directed the Clerk of Court to enter in 77 C 1991 and 78 C 1582, shall not include an award for prejudgment interest, notwithstanding any suggestion to the contrary contained in the memorandum.

SO ORDERED.