John E. GRETCHEN, Appellee,

v.

UNITED STATES of America,
Appellant.

No. 51, Docket 79–6072.

United States Court of Appeals,
Second Circuit.

Argued Sept. 26, 1979.

Decided Feb. 25, 1980.

**178**

David P. Howe, Civil Division, Dept. of Justice, Washington, D.C. (Barbara Allen Babcock, Asst. Atty. Gen., Washington D.C., Robert B. Fiske, Jr., U. S. Atty., S. D. New York, Gilbert S. Fleischer, Civil Division, Dept. of Justice, New York City, of counsel), for appellant.

Alan H. Buchsbaum, Semel, Patrusky & Buchsbaum, New York City, for appellee.

Before MOORE, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

The Government appeals from an award made by the United States District Court for the Southern District of New York, Robert J. Ward, Judge, in a suit under the Public Vessels Act, 46 U.S.C. §§ 781–790, which incorporates the Suits in Admiralty Act, 46 U.S.C. §§ 741–752. Plaintiff, the chief mate of the S.S. Washington, a de-mothballed public vessel, sued for injuries sustained at sea in the early morning of October 17, 1977. Liability (for unseaworthiness) was conceded and the court awarded damages to the injured seaman, in the amounts of $300,000 for past and future lost earnings, an award which the Government does not appeal,[1] and $1 million for past and future pain and suffering, which the Government appeals as excessive. The Government contends incidentally that it was error, under the Public Vessels Act, 46 U.S.C. § 782, and the Suits in Admiralty Act, 46 U.S.C. § 743, to award interest on the judgment (at 4%) from February 7, 1979 (when the judge handed down his oral findings and conclusions), rather than from February 27 (when the formal judgment incorporating them was entered), or March 9 (when an amended judgment was entered). We reverse and remand for further findings in the case of the award for pain and suffering. We reverse the award of twenty days' interest.[2]

Judge Ward conducted a four-day bench trial at which he heard witnesses including the appellee himself; the appellee's wife; Dr. Lawrence Kaplan, a neurologist who treated appellee at Mt. Sinai Hospital; Dr. Gerald L. Andreoli, a urologist from Hazelton, Pennsylvania, near appellee's home town; Dr. Harry Sherman, a general and traumatic surgeon; Eugene P. Spector, who testified as to maritime wages, pensions, and other benefits and practices; and Dr.

---

1. Brief of appellant at 4.

2. Under the Public Vessels Act, 46 U.S.C. § 782, "no interest shall be allowed on any claim up to the time of the rendition of judgment unless upon a contract expressly stipulating for the payment of interest." We agree with the Government that "rendition of judgment" must be construed, in the light of our earlier cases, to mean the formal entry of judgment, e. g., *Canadian Aviator, Ltd. v. United States*, 187 F.2d 100, 101 (2d Cir. 1951); *The Wright*, 109 F.2d 699, 700–02 (2d Cir. 1940). Here, interest (at 4% pursuant to the Suits in Admiralty Act, 46 U.S.C. § 743) should run from the first date on which there was a judg-

ment decree fixing liability and damages, viz., February 27, 1979. We reject the Government's contention that interest must run from March 9, the date the amended judgment was entered. The only difference between the February 27 decree and the March 9 decree was the date from which interest was ordered to run. Under the reasoning of *Lauro v. United States*, 168 F.2d 714, 715 (2d Cir. 1948), the relevant decree is the one fixing liability and damages, and the effect of later amendments and appeals must be ascertained in the light of this standard. *See Mascuilli v. United States*, 383 F.Supp. 50 (E.D.Pa.1974) (considering the effect of numerous appeals).

Howard Balensweig, an orthopedist who testified for the Government. The trial judge also had before him the deposition of Army Sergeant Edward J. Meyers, who was an eyewitness to appellee's injury and administered first aid to him for the thirty-six hours appellee was on board the S.S. Washington and before he could be helicopter-lifted to a mainland hospital for further care.[3] Exhibits included hospital records from Addenbrooke's Hospital, Cambridge, England, where appellee was admitted on October 19 at 5:00 a. m.; the Hospital of the University of Pennsylvania where he was admitted from Addenbrooke's on November 29, 1977, and discharged on December 3, 1977; the Mt. Sinai Hospital, New York, New York, where he was treated from February 13–17, 1978; and Saint Joseph Hospital, Hazelton, Pennsylvania, where he was treated from December 3, 1978, to December 12, 1978.

In connection with this review, we have read all the testimony and examined these same records. We do not, nor could we if we so desired, upset in any way the judge's extensive findings dealing with the injuries and pain and suffering therefrom. As will be seen, they set forth a picture of a terrible crushing injury which will leave appellant with disability, pain, suffering, discomfort, and inconvenience for the rest of his natural life, the expectancy of which (from the date of trial) is 20.1 years (7,336.5 days). Nor do we take issue with the judge's own evaluation that "this case . . . has certain unique ingredients which I really can't, as I think back, find all combined in any single case." Indeed, he went further, saying that "I cannot, as I sit here, recall a case where there was any more prolonged and more severe initial pain and suffering than I envision having been suffered by Mr. Gretchen during those first 36 hours aboard the S.S. Washington . . . ." Our independent examination of cases involving substantial awards has afforded little basis for a comparative evaluation of the award here,

nor has counsel been able to help us in this respect.[4] We nevertheless remand because we are unable to give the award any meaningful judicial review.

The injury occurred when cargo lashings gave way in heavy seas and appellee, a very active, healthy, well-conditioned man, was pinned on the deck between a "CONEX box" (a cargo container) six to eight feet square and weighing about 2,175 pounds, and a two-and-a-half-ton Army truck. His body seemed to Sgt. Meyers to "cave in," his "shoulders touched"; the court found he had a "severe crushing." In the process, numerous ribs were broken, his pelvis shattered, and his urethra lacerated, he went into and out of shock and unconsciousness several times, for two or three minutes at a time, he thought he was going to die (as did the Sergeant, who in Vietnam had seen seventeen men die), and his pain was such that he was screaming despite four morphine administrations. Because he could not urinate, the Sergeant attempted to make and insert a handmade catheter, but this could not be inserted because of the pain. Hence, appellee went without water. He remained aboard ship in this condition for thirty-six hours before he could be airlifted to a United States Air Force base in the Azores, from which he was taken to the United States Air Force base in Wiesbaden, West Germany, then to Lakenheath, Cambridgeshire, where ultimately he entered Addenbrooke's Hospital. The pain in his pelvic area, his right shoulder, his chest, and right hip was still so severe that the epidureal analgesia administered to him had no effect. His bladder and urethra were surgically repaired with post-operative chest and liver complications. He continues to have pain in his right hip, his shoulder, his chest, and particularly in his right foot, pain which is with him day and night, and he will have it permanently. Complaints of pain are subjective, of course, but here they have objective causes to which the doctors

---

3. Sergeant Meyers won a commendation for his efforts.

4. Both counsel have cited us to generalities, not particulars, and although our examination has disclosed many large awards, they have come in entirely different situations.

testified skillfully and in depth and which are discussed below. In addition, he has to wear a diaper day and night because of urethral strictures, he is impotent and incapable of having an erection, he is depressed and, though not suicidal, is a changed person unable to enjoy the social life with his wife, family, and neighbors that he enjoyed previously, or to do the "handyman" type of work around the house that he did previously. A hernia caused by the accident has been surgically repaired.

Objective neurological findings include an absent ankle reflex with diminished sensation to pin-prick, limited straight leg raising and nerve root involvement chiefly in the fifth lumbar and first sacral nerve roots, resulting in a "causalgic syndrome," with, in the words of the neurologist, "an intractable kind of pain the quality of which is mostly a burning sensation." This causalgic syndrome caused him to limp, and resulted in a certain amount of swelling and discoloration of his right foot and demineralization of the bones of the foot and ankle on X-ray, a "reflex sympathetic dystrophy" also known as "Sudeck's atrophy."

Other neurological findings related to the terminal nerve endings to the cavernous venous system of the penis, causing potency problems. Urological findings were, however, more specific. He has stricture formation in his membranous urethra, about or near the prostate, affecting his ability to urinate and causing him on standing or in stress to lose varying amounts of urine. This in turn makes him prone to infection in the area, and the pathophysiologic process is ongoing; it can be relieved every three or four years with surgical dilation but cannot be eliminated. His inability to obtain an erection—the urologist said he would never have a "complete" one—is owing to a disruption of the retropubic veins and the veins coming from the penis, "almost totally negat[ing] the penile venous flow," accompanied with a disruption from the crushing injury to the integrity of the nerve erigents.

Skeletally, he was found to have markedly diminished respiratory expansions and breath sounds on the right, tenderness over the right upper posterior ribs, a decrease in the normal forward curve of the lower back with tight muscles and limited anterior posterior motion and lateral motion much more limited on the right than the left, all motion accompanied by pain. The Lasegue and straight leg-raising tests, both standard objective tests, as well as the Patrick test, were all severely positive, demonstrating sacroiliac joint damage. Flexion, extension, abduction, and internal rotation were all "markedly restricted" on the right and "moderately restricted" on the left. X-rays showed normal healing of the rib fractures but permanent asymmetry of the pelvic ring due to uniting of the multiple pelvic fractures in poor position. This causes a tilt on the left which has not yet had but will have an effect on the acetabula or hip joint sockets. He has atrophy in both his right biceps and right leg muscles, as well as inflammation of the C–6 nerve root causing decreased sensation in his right arm.

Expressed in somewhat more lay terminology, appellee walks with a limp and a cane, wears a slipper on his right foot, gets back pain when he sits too long, has trouble with his right arm including numbness, weakness, and pain requiring help in getting on his jacket or coat, and has a partly "frozen" shoulder. Needless to say, there is by no means complete agreement by the experts as to prognosis. Because Judge Ward's findings are not clearly erroneous, we are bound by them and must therefore view the prognosis in a light most favorable to appellee's claim.

 Despite all the foregoing, we cannot say as a matter of law how substantial an award for pain and suffering, which includes non-work-related disability, the injuries would support. As the trial judge said, "he suffered and he suffered severely," and will have pain in the future. But, in order to allow for meaningful appellate review, a more detailed explanation of the basis of the award must be provided. The award should be divided into past pain and suffering and future pain and suffering.

And, unless the matter is settled in the interim on some other basis such as a system of periodic payments, [5] because appellee will have the award for future pain and suffering in a lump sum for present use, there should be applied to it a factor discounting it to present value, the rate of discount to be adjusted for inflation. *Chiarello v. Domenico Bus Service, Inc.,* 542 F.2d 883, 886 n.5 (2d Cir. 1976). While there are dicta in past cases in this circuit approving the practice of leaving lump-sum awards for pain and suffering unadjusted for either inflation or the earning power of money, *Yodice v. Koninklijke Nederlandsche Stoomboot Maatschappij,* 443 F.2d 76, 77 (2d Cir. 1971); *Rapisardi v. United Fruit Co.,* 441 F.2d 1308, 1312 n.7 (2d Cir. 1971), we agree with the court in *Chiarello v. Domenico Bus Service, Inc., supra,* that it is preferable to take these factors into account. *Cf. Dullard v. Berkeley Associates Co.,* 606 F.2d 890 (2d Cir. 1979) (diversity case applying New York law); *Feldman v. Allegheny Airlines, Inc.,* 382 F.Supp. 1271 (D.Conn.1974), *aff'd in part, rev'd in part and remanded,* 524 F.2d 384 (2d Cir. 1975) (diversity case where Connecticut law left the question open).

■ A breakdown of the pain and suffering award into its time elements will, we think, enable us to give the judge's findings more rational review. *See Fuchstadt v. United States,* 434 F.2d 367, 369–70 (2d Cir. 1970); *Rapisardi v. United Fruit Co., supra,* 441 F.2d at 1312–13; *but cf. Lennon v. United States,* 579 F.2d 12 (2d Cir. 1978) (affirming award as not clearly erroneous on the record as a whole). True perhaps, it might be argued that in so obviously speculative an area as determining "pain and suffering," we should not require more of a judge than we do of a jury. But Fed.R. Civ.P. 52(a) does require specific findings, and unlike *Gibbs v. United States,* 599 F.2d 36, 39 (2d Cir. 1979), the record itself does not make apparent the basis of the award. Admittedly, the case law supports a wide range of discretion in the trial judge; we must "give the benefit of every doubt to the judgment of the trial judge." *Dagnello v. Long Island Rail Road Co.,* 289 F.2d 797, 806 (2d Cir. 1961). It will be helpful, however, if in this type of case the district judges will heed the admonition of *Gibbs* to "specify the basis for damages in detail in the findings of fact, which, if nothing else, avoids confusion as well as unnecessary litigation on appeal." *Gibbs, supra. See also Rapisardi v. United Fruit Co., supra,* 441 F.2d at 1311–13. Here, it might even be helpful to have a breakdown for the award for past pain and suffering during the period of time before appellee received hospital treatment, and thereafter to the filing of findings, as well as the amount for future pain and suffering as above set forth. Appellate review in this area, while extremely narrow, must start from a basis of specific facts and conclusions; it cannot be purely arbitrary.

Appellant has presented a substantial basis for a remittitur, but before we can determine the appropriateness and extent of that remedy, we require more detailed findings.

Reversed and remanded.

MOORE, Circuit Judge (Dissenting):

I would reverse and order a new trial as to damages for pain and suffering, unless, by way of remittitur, the $1,000,000 awarded by the trial court be reduced to a sum

---

**5.** Because there can be no serious worry that the judgment-debtor here—the United States Government—will be unwilling or unable to meet its obligations at any time in the foreseeable future, and because of the great uncertainty as to the amount of future pain and suffering appellee will actually undergo, this case would appear to present the ideal situation for compensation cast partially in the form of an annuity, perhaps variable in response to changing circumstances, in place of the usual lump sum.

We note that, absent specific legislative authorization, it is generally regarded as beyond the power of a court to fashion such a remedy. *Slater v. Mexican National Railroad Co.,* 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900 (1904); *see* Fleming, *Damages: Capital or Rent,* 19 U. Toronto L.J. 295 (1969). We also note, however, that nothing prevents the parties here from reaching a settlement on such terms of their own accord.

not in excess of $300,000. Plaintiff has already been awarded the sum of $300,000 for past and future lost earnings. When on top of this amount the trial court adds a million dollars for pain and suffering, both my own and my judicial conscience are shocked because I regard such a figure as grossly excessive. No doubt plaintiff's pain and suffering have been severe, but this factor is present in many personal injury cases. Its presence does not justify making millionaires out of every such victim. The injury was not caused by an intentional tort, but by an accident: the cargo was improperly lashed; the vessel rolled; and plaintiff was caught between shifting cargo.

In *Lennon v. United States*, 579 F.2d 12 (2d Cir. 1978) a judgment of $600,000 was awarded to a Marine veteran for hospital malpractice suffered in a Naval Hospital. As a result of that malpractice, the veteran, who was only 21 years old, had to have his leg amputated. The trial court awarded him $600,000 after finding that he suffered severe pain, that he had formerly engaged in athletics, that he was precluded from following his desired trade, and that his entire future life was adversely affected. A majority of this Court held that although the award was "on the generous side" it was not clearly erroneous. Judge Lumbard dissented and would have reduced the judgment from $600,000 to $300,000. Pain and suffering cannot be eliminated by money, and any attempt to compensate it by such means must be held within reasonable limits. Appellate courts would fail in their reviewing powers were it otherwise. In my opinion this case definitely calls for an exercise of those powers.