Edwin A. BECKCOM, as Executor of
the Estate of Linda M. Beckcom,
Deceased, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 80–CV–18.

United States District Court,
N.D. New York.

May 10, 1984.

As Amended May 16, 1984.

Lewis, Bell & Niles, Plattsburgh, N.Y., for plaintiff; John L. Bell, Plattsburgh, N.Y., of counsel.

Frederick J. Scullin, Jr., U.S. Atty., N.D. N.Y., Albany, N.Y., for defendant; George A. Yanthis, Asst. U.S. Atty., Albany, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

Plaintiff Edwin A. Beckcom has brought this action pursuant to the Federal Tort Claims Act to recover for alleged medical malpractice by employees of the Department of the Air Force. Specifically, plaintiff alleges that a surgeon and nurse practitioner were negligent in failing to properly

diagnose and treat his wife's breast cancer. Though originally brought as an action for damages, plaintiff's decedent Linda M. Beckcom died on May 11, 1983, and this action was converted to one for wrongful death by stipulation of the parties. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, this Memorandum-Decision and Order constitutes the court's findings of fact and conclusions of law. For the reasons that follow the court finds that plaintiff has established a proper case of negligence under New York law and that he is entitled to recover damages against the defendant.[1]

### STATEMENT OF THE CASE

*Factual Background*

Plaintiff's decedent Linda M. Beckcom was born on August 1, 1947. Mrs. Beckcom attended nursing school from 1965 through 1968 and then worked for one year as a registered nurse at Fitzgerald Mercy Hospital in Darby, Pennsylvania. Following Mrs. Beckcom's work at the Fitzgerald Mercy Hospital, she was commissioned as a second lieutenant in the United States Air Force in October of 1969. Mrs. Beckcom served a two-year tour of duty in the Air Force and then received an honorable discharge in October of 1971. The plaintiff and his decedent were married on November 20, 1971. At that time plaintiff Edwin A. Beckcom was a captain in the Air Force and was stationed at Barksdale Air Force Base in Louisiana.

Linda Beckcom first experienced problems with her breasts in March of 1971 when she detected two lumps in her right breast and one lump in her left breast. Mrs. Beckcom was fully familiar with breast self-examination, and it is through this practice that she discovered the lumps. After discovery of the lumps Mrs. Beckcom scheduled an appointment with a surgeon at Barksdale Air Force Base. Dr. David Trent gave Mrs. Beckcom a thorough examination of the breasts and confirmed the presence of the lumps. In order to determine the proper course of treatment, Dr. Trent directed her to return in one month for a follow-up examination.

At the end of one month's time, Mrs. Beckcom returned to Dr. Trent and explained that the lumps in her breasts were becoming painful. It was decided that a biopsy of the lumps be performed, and such biopsy was performed by Dr. Trent. The results of the biopsy on the right breast revealed benign lumps, a condition classified as fibroadenoma. The lump in the left breast was also benign and revealed the presence of fibrocystic breast disease. Fibrocystic breast disease in a woman of Mrs. Beckcom's age is not uncommon, and, therefore, Mrs. Beckcom was not overly concerned by this finding.

Mrs. Beckcom's next experience with lumps in her breasts occurred in January of 1976 when she became aware of a lump in her right breast. An appointment was made for Mrs. Beckcom to see Dr. Stanley Cowen at Plattsburgh Air Force Base. Dr. Cowen examined her breasts and aspirated the cysts in Mrs. Beckcom's right breast. A milky white fluid was removed through the aspiration procedure, and Dr. Cowen initially concluded that Mrs. Beckcom had a galactocele or plugged milk duct. When the lump in her breast did not disappear, Mrs. Beckcom returned to Dr. Cowen who then performed a biopsy on the lump in her right breast in February of 1976. The biopsy revealed fibrocystic breast disease, and Dr. Cowen instructed Mrs. Beckcom to have her breasts examined periodically.

Mrs. Beckcom's next visit to a physician occurred in the fall of 1976 when she was examined by Dr. Alan M. Bloomberg. It is this initial visit with Dr. Bloomberg and Mrs. Beckcom's subsequent visits to the hospital at the Plattsburgh Air Force Base that give rise to the instant lawsuit.

---

**1.** The Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.,* provides that the United States shall be liable in tort to persons aggrieved under the law of the place where the act or omission occurred. *Id.* § 2672 (1982). Thus, the court must apply the substantive law of New York. *Maltais v.* *United States,* 439 F.Supp. 540, 550 (N.D.N.Y. 1977) (citing *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)); *see also Caban v. United States,* 728 F.2d 68, 72 (2d Cir.1984).

*Plattsburgh Air Force Base Clinic*

In November of 1976 Mrs. Beckcom noticed a thickening in her left breast and two lumps in her right breast. She complained to her husband and then made an appointment with the surgical clinic at Plattsburgh Air Force Base. On November 12, 1976 Mrs. Beckcom arrived at the clinic and was assigned to Dr. Alan M. Bloomberg.

When Dr. Bloomberg first saw Mrs. Beckcom on November 12, 1976, she attempted to give her past history and present complaints. However, Dr. Bloomberg refused to allow Mrs. Beckcom to explain her history and told her that he would ask the questions. On this issue the court finds the testimony of Mrs. Beckcom credible and consistent with Mrs. Beckcom's medical records. Although Dr. Bloomberg testified that he did not prevent Mrs. Beckcom from giving her medical history, the medical records for that date do not indicate Mrs. Beckcom's full history, namely, that she had had two prior breast biopsies. Indeed, Dr. Harvey R. Bernard, one of the Government's own witnesses, testified that based upon this review of these medical records, Dr. Bloomberg did not know of Mrs. Beckcom's previous breast biopsies.[2]

Dr. Bloomberg performed a manual examination of the breasts and palpated most of the areas around the axilla or armpit. The doctor, according to Mrs. Beckcom, did not perform a proper visual examination which is used to determine the outward signs of cancer such as skin dimpling or retraction of the nipple.[3] Moreover, Mrs. Beckcom denied that Dr. Bloomberg performed a supraclavicular examination. This is done by the physician pressing his fingers above the collar bone to determine the presence of any abnormal lumps or masses. Regardless of whether this particular diagnostic procedure was performed by Dr. Bloomberg, the initial examination was described by Mrs. Beckcom as not being very thorough.

Dr. Bloomberg's conclusion with respect to the November 12, 1976 examination was that Mrs. Beckcom had fibrocystic breast disease. This conclusion, now admitted to be erroneous, was based upon the fact that Mrs. Beckcom had no family history of breast cancer, Mrs. Beckcom's age, and the doctor's own physical examination. At the end of the examination Dr. Bloomberg directed Mrs. Beckcom to return for a future examination. Although Dr. Bloomberg testified that the next examination should be in approximately three months, Mrs. Beckcom testified that no specific time period was mentioned, but that the doctor simply instructed her to come back. The medical record contains a notation by Dr. Bloomberg indicating a return visit in three months.

Following Mrs. Beckcom's visit to the Plattsburgh Air Force Base surgical clinic, she noticed that there were more lumps developing in her breasts and that the original lumps in her right breast were increasing in size. Specifically, Mrs. Beckcom became aware of a hard, marble-like lump in the lower outer quadrant of her right breast, and lumps in the inner upper aspect and the lower inner aspect of the breast. In addition, the nipple on her right breast started to retract. Such retraction is often

**2.** This court has carefully examined the notation in Mrs. Beckcom's medical records for the examination of November 12, 1976. Dr. Bloomberg testified that, upon his review of the records prior to trial, he could determine that Mrs. Beckcom had had previous breast biopsies. One aspect of the notation is illegible, and the court has been unable to determine the veracity of this statement.

**3.** Since Dr. Bloomberg had no independent recollection of Mrs. Beckcom or her visit of November 12, 1976, the doctor testified as to his usual practice of conducting a breast examination. Dr. Bloomberg testified that he always performed a visual examination, but could not specifically recall whether he had performed one in the instant case. *See* Fed.R.Evid. 406 (permitting evidence of habit or routine practice to be used in determining whether a person acted in conformity with that habit or routine practice on a given occasion). Given Dr. Bloomberg's demeanor in testifying at trial as compared to that of Mrs. Beckcom's, the court finds that Dr. Bloomberg did not perform a visual examination, in the medical sense, on November 12, 1976.

a clue to the development of breast cancer. Mrs. Beckcom consulted with her husband, plaintiff Edwin Beckcom, and then scheduled an appointment with the surgical clinic for March 8, 1977.

Upon Mrs. Beckcom's return to the surgical clinic, she was again assigned to see Dr. Bloomberg. As with the first visit Dr. Bloomberg did not allow Mrs. Beckcom to fully present her complaints, but insisted upon asking his own questions. The doctor performed a manual examination of the breasts and concluded that the lumps were nothing more than small, multiple cysts. Dr. Bloomberg rejected Mrs. Beckcom's suggestion that she have a mammogram due to Mrs. Beckcom's young age and the possible dangers of excessive radiation.

The medical record for this visit is silent as to the question of a mammogram, and Mrs. Beckcom testified that Dr. Bloomberg did not inquire whether she had ever had a mammogram. Indeed, the court notes that both entries on Mrs. Beckcom's medical records for her visits with Dr. Bloomberg are sketchy at best. Therefore, since Dr. Bloomberg testified that he had no independent recollection of Mrs. Beckcom or her two visits, the court must credit Mrs. Beckcom's testimony in this regard.[4] At the conclusion of the examination Dr. Bloomberg instructed Mrs. Beckcom to return for a follow-up examination in six months. The doctor also told Mrs. Beckcom that it was "ridiculous" for her to come in for examinations as often as she had been coming. Mrs. Beckcom understandably felt quite relieved when the doctor told her not to worry about the lumps in her breasts.

Mrs. Beckcom continued to experience lumps in her breasts throughout the months following her visit with Dr. Bloomberg. On July 20, 1977 Mrs. Beckcom was seen at the clinic for a routine gynecological examination by Major Theresa Robertson, a nurse practitioner. Major Robertson examined Mrs. Beckcom's breasts and, after being told of Dr. Bloomberg's prior diagnosis of fibrocystic breast disease, Major Robertson noted in the records that no other problems were present. Mrs. Beck-

com's subsequent medical treatment will be explored below. Although these experiences are not relevant to this action in terms of liability, they will be recounted in order to more fully understand the court's position with respect to damages.

*Dr. Medina*

Mrs. Beckcom continued to experience problems with her breasts in the period following her examination by Major Robertson. Mrs. Beckcom noticed that the lumps in her right breast increased in size, and she also experienced some pain in her breasts during exercise. Accordingly, she scheduled another appointment at the surgical clinic and was seen on October 26, 1977 by Dr. Oswaldo Medina. Dr. Medina, a general surgeon on the clinical staff, felt two masses in the right breast at the inner upper quadrant and the outer quadrant measuring 8 centimeters and 2 centimeters respectively. The doctor also felt smaller masses in the breast and noted palpable lymph nodes in the right axilla. Due to the number and size of the lumps, Dr. Medina scheduled Mrs. Beckcom for a breast biopsy.

The biopsy on Mrs. Beckcom's right breast was performed on October 31, 1977, and two breast masses were removed and sent to a laboratory at the Champlain Valley Physician's Hospital for examination. The results of the biopsy proved that Mrs. Beckcom had infiltrating ductile carcinoma, or cancer of the breast.

After consultation with the plaintiff Edwin Beckcom, Mrs. Beckcom agreed to have a right radical mastectomy. The operation was performed on November 2, 1977 by Dr. Medina and a civilian physician, Dr. George P.N. Boolukos. The operation consisted of the removal of the breast tissue, the axilla, and all of the underlying muscles. Mrs. Beckcom remained in the hospital for approximately two weeks after the operation and experienced considerable pain and discomfort as might be expected from such a major surgical procedure.

---

**4.** *See note 3, supra.*

Due to the high degree of probability that Mrs. Beckcom's cancer had spread to her left breast, a mammogram was performed on November 9, 1977. This proved inconclusive, although a definite dominant mass lesion could be identified in the left breast area. Because of the suspicious nature of the results and the great degree of involvement of the cancer in Mrs. Beckcom's right breast,[5] a second biopsy was performed. Although another radical mastectomy was indicated, it was determined that Mrs. Beckcom could not undergo such an operation in her then physical and emotional state. Accordingly, a subcutaneous mastectomy was performed on Mrs. Beckcom's left breast on November 21, 1977.

After her release from the hospital Mrs. Beckcom was referred by Dr. Medina to Dr. James C. Chingos, an oncologist at the Champlain Valley Physicians Hospital Medical Center. Dr. Chingos placed Mrs. Beckcom on an aggressive chemotherapy regimen. This course of treatment greatly debilitated Mrs. Beckcom, but had the effect of slowing the growth of her cancer to some degree. The chemotherapy continued until November or December of 1979, at which time Mrs. Beckcom and her husband had moved to Lawrence, Kansas.

### Dr. Gray

Upon Mrs. Beckcom's arrival in Kansas she was referred to Dr. Captain K. Gray at the Kansas University Medical Center. Dr. Gray discovered a mass in the cervical chain of the left side of the neck. Such mass was biopsied by Dr. John Reese, and it was determined that the cancer from Mrs. Beckcom's breast had spread to her neck. The lumps in her neck were then removed by Dr. Reese.

Later in the year Dr. Gray ordered a series of bone scans which revealed that the cancer was spreading to Mrs. Beckcom's hips, ribs and cervical spine. The spread of the disease caused a great amount of discomfort to Mrs. Beckcom, who was eventually put on radiation therapy in an attempt to alleviate her pain.

While the treatment was helpful to a limited extent, Mrs. Beckcom's pain continued, and in January of 1980 it was discovered that the cancer had spread to her brain and bony skull.

Mrs. Beckcom continued to see Dr. Gray on a regular basis and resumed her chemotherapy as a supplement to the radiation treatments. In 1981 the cancer spread to Mrs. Beckcom's lumbar spine and left hip. Appropriate treatment and surgery followed.

### Treatment in Texas

In August of 1982 then Lieutenant Colonel Beckcom was transferred from Kansas to Carswell Air Force Base in Fort Worth, Texas. At this time Mrs. Beckcom began to receive treatment at the Arlington Cancer Treatment Center in Arlington, Texas. Mrs. Beckcom continued with her chemotherapy as the cancer spread through her hips and into her lower back area.

In the early spring of 1983 Mrs. Beckcom began what was to be the last of her experiences in going to the hospital for treatment of her disease. She was admitted to a hospital in Fort Worth on or about March 5, 1983. Mrs. Beckcom remained in the hospital for two days and was then transferred to a facility called Wilfred Hall in San Antonio. Due to the advanced degree of the disease in Mrs. Beckcom's body, she experienced numerous problems with her joints and was forced to undergo hip replacement surgery. This operation had to be repeated on several occasions to replace the hip joint which kept coming out of place. Mrs. Beckcom was released from the hospital only to return at the end of the month.

Mrs. Beckcom's last days were accompanied by additional operations to clear a blocked bowel and to relieve other aspects of her discomfort. At this time Mrs. Beckcom was under constant medication and was experiencing a great deal of pain. Finally, Mrs. Beckcom died at the Carswell Air Force Base Hospital on May 11, 1983.

---

**5.** The pathology report from Mrs. Beckcom's first operation indicated that there was infiltrating duct carcinoma of the right breast with metastasis to six axillary lymph nodes out of the eleven nodes that had been isolated.

*The Pleadings and Trial*

Plaintiff commenced this action on January 4, 1980 as one for damages. The original complaint contained a count for damages by Mrs. Beckcom for the negligent failure of Dr. Bloomberg and Major Robertson to properly diagnose and treat her breast cancer. A second count alleged loss of consortium by Edwin Beckcom. Linda Beckcom sought $2,500,000.00 in damages, and Edwin Beckcom sought $2,000,000.00 in damages. The Government denied negligence on the part of its employees and pleaded as an affirmative defense that Mrs. Beckcom's injuries were not proximately caused by the negligent wrongful acts or omissions of the United States.

Following Mrs. Beckcom's death and at the conclusion of the trial on June 9, 1983, it was agreed by the parties that an amended complaint be filed to take into consideration the changed nature of the case. Accordingly, on March 19, 1984 plaintiff filed his amended complaint which added a third cause of action for wrongful death. In addition, the first count of the complaint was amended to reflect Edwin Beckcom's role as executor of his wife's estate.

Due to Mrs. Beckcom's poor health, the court took her testimony prior to trial, on July 6, 1982. The formal trial commenced on March 2, 1983 and continued on March 3. At that time the trial was adjourned until June. Testimony was taken on June 8, 1983 and June 9, 1983, and the briefs of the parties were received by the court on or about April 2, 1984.

Plaintiff offered the testimony of Mrs. Beckcom and plaintiff Edwin Beckcom as well as Mrs. Beckcom's mother, Mary McCombs. In addition, Drs. Chingos, Boolukos and Barry L. Singer testified for the plaintiff as did economist Harold D. Birckmayer. Defendant offered the testimony of Drs. Bloomberg, Bernard and R. Robinson Baker.

## DISCUSSION

The issue before the court, though emotionally charged, is a relatively simple one. Namely, were Dr. Bloomberg and Major Robertson negligent in failing to properly diagnose and treat Linda Beckcom's breast cancer in the period from November of 1976 through July of 1977? Defendant's witnesses, including Dr. Bloomberg, have all admitted that Dr. Bloomberg's initial diagnosis of fibrocystic breast disease was in error. This is not, however, dispositive of the liability issue in this case. Rather, the court must determine whether this misdiagnosis rose to the level of medical malpractice under the law of New York.

■ As stated by New York's encyclopedia of law, it is a universally accepted rule

> that a physician must possess that reasonable degree of learning, skill, and experience which ordinarily is possessed by others of his profession, and that he must exercise reasonable and ordinary care and diligence in the exertion of his skill and the application of his knowledge, and must exert his best judgment as to the treatment of the case intrusted to him—in short, a physician is bound to bestow such reasonable and ordinary care, skill, and diligence as physicians and surgeons in good standing in a locality such as his, in the same general line of practice, ordinarily have and exercise in like cases.

45 N.Y.Jur., *Physicians and Surgeons*, § 132 at 386 (1973); *see also Pike v. Honsinger*, 155 N.Y. 201, 209–10, 49 N.E. 760, 765 (1898). Nevertheless, a physician will not be held liable for a mere misdiagnosis when he makes a decision based upon a good faith or bona fide judgment. *Id.; Spadaccini v. Dolan*, 63 A.D.2d 110, 117, 407 N.Y.S.2d 840, 844 (1st Dep't 1978); 1 N.Y. Pattern Jury Instructions, 2:150 (1974).

■ In reviewing the evidence to determine the sufficiency of plaintiff's proof, the court must keep in mind the four elements necessary to make out a prima facie case of malpractice under New York law. Plaintiff must prove (1) that the doctor had a duty to conform to a particular standard of conduct, (2) that he failed to measure up to that standard of conduct, (3) that the plaintiff suffered actual damage, and (4) that the doctor's conduct was the proximate

cause of the plaintiff's injury. *Monohan v. Weichert,* 82 A.D.2d 102, 105–8, 442 N.Y. S.2d 295, 297–98 (4th Dep't 1981) (citing *Pike v. Honsinger,* 155 N.Y. at 209–10, 49 N.E. 760); *see also* Annot., *Malpractice in Connection with Diagnosis of Cancer,* 79 A.L.R.3d 915, § 2[b] at 924 (1977). Here, it is undisputed that both Dr. Bloomberg and Major Robertson were under a duty to conform their conduct to that practiced by general surgeons and nurse practitioners in the Plattsburgh, New York area in late 1976 and early 1977. Moreover, it is undisputed that Linda Beckcom suffered actual damage. Thus, the court must focus on the breach of duty and proximate cause elements of plaintiff's case.

*Breach of Duty*

As a preliminary matter the court notes that count one of the amended complaint speaks in terms of the negligence of both Dr. Bloomberg and Major Robertson. At the trial, however, no proof was adduced to demonstrate a breach of duty by Major Robertson. In view of the lack of proof on this issue, *see* 45 N.Y.Jur., *Physicians and Surgeons, supra,* § 185 (requiring expert testimony to make out a prima facie case of malpractice), the court hereby strikes those allegations as they pertain to Major Robertson. Thus, the court will concentrate on the conduct of Dr. Bloomberg.

Plaintiff presented expert testimony by Drs. Chingos and Boolukos to demonstrate that Dr. Bloomberg's conduct and course of treatment fell below the standard of care generally exercised by general surgeons in the locality at the time of the acts complained of. Specifically, the doctors testified that a woman of Mrs. Beckcom's age, history and present complaints should have been scheduled for one or more of the following diagnostic procedures: mammogram, biopsy and aspiration. In addition, the doctors testified that Mrs. Beckcom should have been directed to return for a

second examination in a relatively short amount of time, such as one month.

In response to the above testimony the Government produced its expert witnesses Drs. Baker and Bernard. These doctors, who admittedly never treated Mrs. Beckcom and were only giving their opinions based upon a review of medical records, testified that Dr. Bloomberg did not deviate from the accepted standard of care.[6] With regard to the alternative diagnostic procedures suggested by plaintiff's experts, Drs. Baker and Bernard testified that such procedures were not necessarily appropriate for a patient of Mrs. Beckcom's age, history and present complaints. Moreover, the doctors testified that certain of the procedures, most notably mammography, presented certain health risks to the patient that outweighed their diagnostic value.

As to the possible detrimental effects of mammography, plaintiff presented the expert testimony of Dr. Barry L. Singer on rebuttal. Dr. Singer testified that a single mammogram for Linda Beckcom would not have been detrimental and would have been useful as a diagnostic tool.

The court has carefully considered the above testimony, along with the demeanor and qualifications of the witnesses, and finds that the plaintiff has proved by a fair preponderance of the evidence that Dr. Bloomberg deviated from the appropriate standard of care and treatment with respect to Linda Beckcom. Specifically, Dr. Bloomberg failed to conduct a proper examination of Linda Beckcom on November 12, 1976 by: (1) not taking a complete history and preventing Mrs. Beckcom from giving the same, (2) not conducting a visual examination of the breasts, and (3) not directing Mrs. Beckcom to return for a follow-up examination in a period sooner than three months. Notwithstanding the above, Dr. Bloomberg deviated from the

6. The Government also presented Dr. Bloomberg as a witness. The doctor was not offered as an expert witness, but was merely offered to explain the procedures and course of treatment followed by him with respect to Mrs. Beckcom.

During cross-examination, however, plaintiff's counsel questioned Dr. Bloomberg as an expert witness and this course was followed by the Assistant United States Attorney on redirect examination.

appropriate standard of care and treatment on March 8, 1977 by: (1) preventing Mrs. Beckcom from giving her present complaints, (2) not performing one or more of the following procedures: aspiration, biopsy or mammogram, and (3) telling Mrs. Beckcom that it was ridiculous for her to keep coming in for examinations so frequently.

With regard to Mrs. Beckcom's first visit to Dr. Bloomberg on November 12, 1976, this court has already found that Dr. Bloomberg improperly prevented Mrs. Beckcom from giving her complete history. All of the expert witnesses including the Government witnesses testified as to the importance of taking a proper history from a patient. This court had an opportunity to observe both Mrs. Beckcom and Dr. Bloomberg when they testified in this matter. Considering this testimony along with the inadequate notes taken by Dr. Bloomberg, the conclusion that Dr. Bloomberg was negligent in taking Mrs. Beckcom's history is well supported by the record. This conclusion applied with equal force to Dr. Bloomberg's failure to perform a visual examination of the breasts.[7]

As to Dr. Bloomberg's failure to instruct Mrs. Beckcom to return for a follow-up visit sooner than three months, the court notes that there is a discrepancy in the testimony on this point. Mrs. Beckcom specifically denies that Dr. Bloomberg told her to return in any given period of time. This is so notwithstanding the fact that Dr. Bloomberg's medical notes indicate that a three month follow-up visit was recommended. In any event plaintiff's experts testified that a follow-up examination should have been scheduled in a short amount of time. A one month's delay would have been appropriate so that Dr. Bloomberg could determine whether the hormonal changes occurring during Mrs. Beckcom's menstrual cycle had any effect

on the lumps in her breasts. Considering Dr. Bloomberg's failure to palpate the discrete masses present in Mrs. Beckcom's breast, his subsequent failure to properly schedule a follow-up visit is understandable. Such a failure is not excusable, however, when the court considers the inadequate examination performed by Dr. Bloomberg in the first instance.

Plaintiff also alleges that Dr. Bloomberg was negligent in failing to order a mammogram, biopsy and/or aspiration of the lumps in Mrs. Beckcom's breasts during the November 12, 1976 visit. On this issue the court believes that plaintiff has not sufficiently met his burden of proof. Both Drs. Baker and Bernard testified ably that such procedures were not warranted considering Mrs. Beckcom's condition at the time. Dr. Baker, the Government's principal witness, is a professor of surgery and oncology at the Johns Hopkins University Medical School. Dr. Baker is board certified in both general and thoracic surgery and specializes in the treatment of patients with malignant tumors. Dr. Bernard, the Government's second witness, is a general surgeon who is board certified in surgery and who presently works at the Albany Medical Center.

The court agrees with Drs. Baker and Bernard that these alternative diagnostic procedures were not warranted with respect to the November 12, 1976 visit. At the very least the court believes that the failure of Dr. Bloomberg to utilize these procedures did not amount to medical malpractice.

With regard to Mrs. Beckcom's second visit to Dr. Bloomberg on March 8, 1977, the court has little difficulty in determining that Dr. Bloomberg deviated from the appropriate standard of care and treatment. Dr. Baker indicated that a hard, discrete mass in the breast such as Linda Beckcom

---

7. On two separate occasions during the course of the trial, objections were made to reputation testimony concerning Dr. Bloomberg. On the first occasion Linda Beckcom was describing what Dr. Medina had said about Dr. Bloomberg's ability to diagnose breast cancer. On the second occasion Dr. Boolukos was describing Dr. Bloomberg's reputation in the medical community. Although the court reserved decision on these objections, such testimony was not considered by the court in its decision. Thus, there is no need to address the merits of these objections.

described in March of 1977 should have been biopsied. Moreover, Dr. Baker testified that a biopsy performed in March of 1977 probably would have detected cancer. Dr. Baker further testified that mammography would have been useful in making a determination about the cancerous nature of the lumps in Mrs. Beckcom's breasts.

Dr. Bernard indicated that a hard, discrete mass such as the one Mrs. Beckcom testified to should have been biopsied. The doctor also testified that due to the advanced degree of the disease found by Dr. Medina in October of 1977, a biopsy would probably have revealed cancer in March of 1977.

While Drs. Baker and Bernard were hesitant to state whether a hard, discrete mass would have been palpable in March of 1977, Drs. Chingos and Boolukos were unequivocal when they testified that such a mass would definitely have been palpable by Dr. Bloomberg on March 8, 1977. Dr. Chingos, one of plaintiff's treating physicians, is a specialist in oncology who has spent time working at the Sloan Kettering Cancer Institute in New York. Dr. Chingos is also a professor of medicine. Dr. Boolukos, another of plaintiff's treating physicians, is a general surgeon who is board certified in surgery.

Considering all of the testimony and documentary evidence received, the court finds that such a mass was not only present in Mrs. Beckcom's breast on March 8, 1977, but that it was also palpable. Thus, Dr. Bloomberg was negligent in either failing to discover the existence of the mass and/or failing to order a biopsy. Along this same line the court finds that Dr. Bloomberg could have attempted to aspirate the lumps or mass in Mrs. Beckcom's breast. All of the experts testified that aspiration was a useful diagnostic tool under the appropriate circumstances, and the court believes that Dr. Bloomberg should have considered using aspiration in the event that he felt a biopsy unwarranted.

This brings the court to the question of mammography. All of the experts testified that the use of mammography in women of Mrs. Beckcom's age was inappropri-

ate under normal circumstances. However, each of the experts testified that a single mammogram performed on Mrs. Beckcom on March 8, 1977 would not have proved harmful. In addition, the experts testified that a mammogram would probably have shown that Mrs. Beckcom had cancer on March 8, 1977. It is also undisputed that Mrs. Beckcom had never had a mammogram prior to her visit with Dr. Bloomberg on March 8, 1977, and that Dr. Bloomberg never inquired whether Mrs. Beckcom had ever undergone such a procedure. This is especially troubling to the court considering the fact that Mrs. Beckcom specifically asked Dr. Bloomberg directly whether she should have a mammogram.

Dr. Baker testified that he found mammography to be approximately 85% accurate in detecting the presence of breast cancer. Dr. Baker qualified this statement, however, by testifying that this technique is considerably less helpful in young, premenopausal women such as Mrs. Beckcom. This lesser degree of accuracy is due to the fact that premenopausal women have very dense breast tissue, and the contrast between a tumor and the breast tissue is not as striking as it would be in postmenopausal women. While Dr. Baker testified that he would not have ordered a mammogram on November 17, 1976, the doctor did admit on cross-examination that he would have ordered a mammogram on March 8, 1977, if Mrs. Beckcom had presented a hard, marble-like lump in her right breast.

Dr. Bernard testified that mammography was not indicated in either November of 1976 or March of 1977. The court notes again that Dr. Bernard, like Dr. Baker, testified solely on the basis of Dr. Bloomberg's notations in the medical records and not from his direct examinations of Mrs. Beckcom.

Dr. Chingos testified that mammography was indicated both in November of 1976 and March of 1977. Dr. Boolukos testified in a similar fashion.

Lastly, Dr. Singer, plaintiff's rebuttal witness, testified that mammography was

indicated for Mrs. Beckcom. Dr. Singer is a specialist in internal medicine with subspecialities in hematology and oncology. The doctor is board certified in each of his subspecialties. In addition, Dr. Singer testified at length to the possible hazards and benefits of a single mammogram in a woman of Mrs. Beckcom's age. Although not dispositive of the issue, Dr. Singer thought it significant that Mrs. Beckcom specifically inquired of Dr. Bloomberg whether a mammogram was indicated. Considering Mrs. Beckcom's background as a nurse, such a request should have eased Dr. Bloomberg's fears about possible radiation injury to Mrs. Beckcom.

The court has considered the expert testimony along with the qualifications of the experts and concludes that Dr. Bloomberg was negligent in failing to order a mammogram for Linda Beckcom on March 8, 1977. Mrs. Beckcom presented herself to Dr. Bloomberg with continuing complaints about lumps in her breasts. This condition had not improved, but rather worsened, since the last time that Mrs. Beckcom was seen by the doctor. Dr. Bloomberg rejected Mrs. Beckcom's request for a mammogram and even failed to inquire whether one had ever been done in the past. The doctor further compounded his error by informing Mrs. Beckcom that it was ridiculous for her to return so often. As was explored above, such a recommendation was clearly erroneous and deviated from the appropriate standard of care and treatment that Dr. Bloomberg should have followed.[8] Having found that Dr. Bloomberg deviated from the appropriate standard of care and treatment with respect to Linda Beckcom, the court will now proceed to a discussion of whether that deviation was the proximate cause of Mrs. Beckcom's injuries and/or death.

*Proximate Cause*

In the present case all of the experts agree that Dr. Bloomberg incorrectly diagnosed Mrs. Beckcom's breast cancer as fibrocystic breast disease. In addition, it is generally agreed that Mrs. Beckcom's cancer was present in November of 1976. Thus, it was incumbent on plaintiff to prove that Dr. Bloomberg's negligence was the proximate cause of the injuries and/or death of Linda Beckcom.

New York law provides that "[a]n act or omission is a proximate cause of an injury if it was a substantial factor in bringing about the injury, that is, if it had such an effect in producing the injury that reasonable men would regard it as a cause of the injury." 1 N.Y. Pattern Jury Instructions, § 2:70 (1974); *Monahan v. Weichert*, 82 A.D.2d at 107, 442 N.Y.S.2d at 298 (citing *Dunham v. Canisteo*, 303 N.Y. 498, 504, 104 N.E.2d 872). The proximate cause issue has, of course, been somewhat clouded by Mrs. Beckcom's death and the fact that she already had cancer at the time she first visited Dr. Bloomberg.

Dr. Boolukos, as did all of the other expert witnesses, testified to the importance of early detection of breast cancer. Dr. Boolukos also emphasized that in the management of breast cancer, it is vital to begin treatment as early as possible so as to minimize the need for radical procedures. With regard to Mrs. Beckcom, Dr. Boolukos testified at the trial before her death. Thus, Dr. Boolukos understandably could not be expected to have testified about the effect of Dr. Bloomberg's negligence as it related to her death. Nevertheless, Dr. Boolukos stated emphatically that Mrs. Beckcom's life span had been considerably shortened. If the cancer had been discovered one year earlier, Dr. Boolukos believed, Mrs. Beckcom's pain and suffering would have been lessened to a large degree and it would have made a tremendous difference in terms of her ability to survive the disease.

Dr. Chingos also stated that Mrs. Beckcom's chances for a complete cure would have been better had the cancer been discovered earlier than the fall of 1977. Dr. Chingos testified that, if Dr. Bloomberg had properly scheduled Mrs. Beckcom for a return visit in December of 1976 and had

---

**8.** Dr. Baker, the Government's principal witness, indicated that Dr. Bloomberg should not have told Mrs. Beckcom that it was ridiculous for her to keep coming so often for examinations.

discovered the cancer, Mrs. Beckcom's prospects for survival would have been in excess of 80–85%. Had the cancer been discovered in March of 1977, Dr. Chingos believed that Mrs. Beckcom's outlook in terms of management and/or cure would have been better. In short, the doctor testified that there would have been a greater likelihood of control, if not cure, had Dr. Bloomberg not been negligent. Part of the basis for Dr. Chingos' opinion was the rapidity with which Mrs. Beckcom's cancer metastasized. The doctor explained that Mrs. Beckcom's first breast biopsy in February of 1976 was negative. Thus, the cancer had to spread at a fairly quick rate of speed considering the size of the mass found at the time of her mastectomy in the fall of 1977.

Dr. Singer also testified that Mrs. Beckcom's prognosis would have been considerably better if the cancer had been discovered earlier. The doctor testified that if an excisional biopsy had been performed at or about the time of the November 12, 1976 examination Mrs. Beckcom may well have had an 85% chance of survival. While Dr. Singer also testified that a modified mastectomy of Mrs. Beckcom's right breast was probably indicated in November of 1976, Dr. Singer opined that Mrs. Beckcom's pain and suffering were greatly enhanced by the late diagnosis of her cancer. Such a late diagnosis, according to Dr. Singer, had the effect of allowing the cancer to spread to the axillary nodes and then become seeded throughout the body. Dr. Singer did concede that Mrs. Beckcom's condition was such that she would probably have had to undergo chemotherapy and/or radiation therapy. Nevertheless, Dr. Singer testified that Mrs. Beckcom's pain and discomfort from such therapy would have been considerably more tolerable.

Dr. Baker's opinion was that Mrs. Beckcom had a relatively poor prognosis and that her chances of survival were not much greater had the cancer been discovered in 1976 as opposed to 1977. Dr. Baker testified that Mrs. Beckcom would have undoubtedly been required to undergo a mastectomy of her right breast. The doctor conceded that a radical mastectomy would not have been indicated if Dr. Bloomberg had diagnosed the cancer in November of 1976. Lastly, Dr. Baker stated that Mrs. Beckcom would have been required to undergo some form of chemotherapy and would have had pain and suffering regardless of when the cancer was discovered. These opinions were qualified, however, by Dr. Baker's opinion that the chemotherapy might not have been as drastic and the pain and suffering would have been of a lesser type.

Dr. Bernard's testimony was even more pessimistic than that of Dr. Baker. Dr. Bernard was of the opinion that the tumor in Mrs. Beckcom's right breast was present for a year or more before its discovery. In addition, Dr. Bernard testified that the cancer had probably metastasized in November of 1976 and that discovery of the same by Dr. Bloomberg would not have made a great deal of difference in terms of Mrs. Beckcom's ultimate rate of survival.

■ The court has carefully considered all of the above testimony and the factual bases behind the opinions of the various experts. In particular, the court has taken into account the fact that Linda Beckcom had a breast biopsy performed in February of 1976 and such biopsy proved benign. Moreover, the court has considered the testimony and evidence concerning the size of the mass removed from Mrs. Beckcom's breast at the time of her mastectomy in November of 1977. Lastly, the court has considered the evidence put forth by both parties concerning the "doubling time" of cancer cells and the application of this theory to the case at bar. After due deliberation the court finds that the negligence of Dr. Bloomberg was the proximate cause of Linda Beckcom's injuries. While Mrs. Beckcom's actual death may not have been caused by this negligence, her life span suffered a marked decrease and she was forced to undergo excruciating pain and suffering. Mrs. Beckcom was also forced to undergo advanced and drastic surgery that would not have been necessary had her cancer been properly diagnosed and treated. In addition, Mrs. Beckcom's hus-

band, plaintiff Edwin Beckcom, was injured by this negligence through the loss of the comfort, society and consortium of his wife. This brings the court to the question of damages.

## DAMAGES

The issue of damages in a case such as this is a particularly difficult one. Surely, no amount of money can replace a life nor bring true comfort to Edwin Beckcom and his two sons for the loss of their wife and mother. In the context of an action brought under the Federal Tort Claims Act, the court is also mindful that it may not award punitive damages to punish the de-fendant for the actions of its employee. 28 U.S.C. § 2674 (1982). The court is also limited in another respect by the amount of money sought in the first instance in the administrative claim. 28 U.S.C. § 2675(b) (1982); *O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842 at 855–56 (2d Cir.1984).[9]

In the first and third causes of action in the amended complaint, plaintiff seeks damages for the conscious pain and suffering of Linda Beckcom occasioned by her countless surgical procedures and related therapy as well as the mental anguish attendant thereto. Moreover, plaintiff seeks damages for the pecuniary loss suffered by

9. In *O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842 at 855 (2d Cir.1984), the Second Circuit considered 28 U.S.C. § 2675(b) (1982) for the first time and concluded that this section should not be used in the same fashion as the more liberal Rule 15 of the Federal Rules of Civil Procedure. Section 2675(b) permits an action to be instituted for an amount greater than that presented in the administrative claim in only two circumstances: (1) newly discovered evidence, or (2) intervening facts relating to the amount of the claim. With regard to the second set of circumstances, the court held that they must be of the type that are truly new and unforeseen. *Id.* at 855–56.

Here, a slightly different problem has arisen. Plaintiff initially presented two administrative claims in May and June of 1979. The claim for injuries to Linda Beckcom was $1,250,000.00, and the claim for loss of consortium by Edwin Beckcom was $200,000.00. When this action was commenced in January of 1980, the *ad damnum* clause for Linda Beckcom's personal injury cause of action was $2,500,000.00. The *ad damnum* clause for Edwin Beckcom's loss of consortium cause of action was $2,000,000.00. In the short amount of time between the filing of the administrative claims and the commencement of the instant action, there was neither an unexpected change in the law, *Funston v. United States*, 513 F.Supp. 1000 (M.D.Pa.1981), nor any drastic change in Mrs. Beckcom's medical diagnosis, *Husovsky v. United States*, 590 F.2d 944 (D.C.Cir.1978). Thus, plaintiff was not entitled to increase his *ad damnum* to an amount in excess of that contained in his administrative claim.

At the conclusion of the trial on June 9, 1983, it was stipulated by the parties and approved by the court that plaintiff file an amended complaint to properly set forth Edwin Beckcom's status as executor of his wife's estate. No discussion was had with respect to increasing the *ad damnum*. However, since a cause of action for wrongful death and one for survival are entirely separate and distinct under New York law, plaintiff's amended complaint containing a third cause of action is procedurally valid. *Compare* N.Y. Est. Powers & Trusts Law § 5–4.1 (McKinney Supp.1983–84) (wrongful death) *with* N.Y. Est. Powers & Trusts Law § 11–3.2 (McKinney 1967 & Supp.1983–84) (survival). Thus, the only issue to be determined is that of the increased *ad damnum*. The court notes, however, that plaintiff's request for interest from the date of Linda Beckcom's death, proper under New York law, is barred by 28 U.S.C. § 2674 (1982). Accordingly, that aspect of the *ad damnum* is hereby stricken.

The increase in the *ad damnum* from the original $1,450,000.00 presented in the administrative claim to the present figure of $7,000,-000.00, though staggering, has not severely prejudiced the Government. The administrative claim was rejected, and there is no reason to think Mrs. Beckcom's death would have changed that result. *See* Amended Answer ¶ 2 (denying negligence on the part of Dr. Bloomberg). *See also* Government's Post-Trial Memorandum of Law at 9–18 (denying negligence and proximate cause). In addition, Mrs. Beckcom's death in May of 1983 was something that could not have been presented to the administrative agency in 1979, nor pleaded in the original complaint in 1980.

Considering the testimony from plaintiff's expert as to the economic loss to plaintiff and his sons from the death of Mrs. Beckcom, the court does not find the *ad damnum* in the third cause of action to be excessive. In any event this court's award of damages to Linda Beckcom for her conscious pain and suffering, as well as the award to Edwin Beckcom and his sons for Linda Beckcom's wrongful death, does not exceed the $1,250,000.00 sought by Linda Beckcom in the first instance. Accordingly, the Government's assertion, by way of its third affirmative defense, that the amended complaint is somehow deficient must be rejected.

him and his children as a result of the death of Linda Beckcom.

There was testimony from Linda Beckcom about the severe pain, discomfort and mental anguish that she suffered. Such testimony was reinforced by plaintiff Edwin Beckcom and Linda Beckcom's mother, Mary McCombs. All of the medical experts testified that Mrs. Beckcom's medical condition and therapy were such as to be quite painful, and the court finds that Mrs. Beckcom was subjected to a tremendous amount of pain and mental suffering. Her actual physical injuries are a part of the record and need not be recounted here.

With regard to the mental anguish suffered by Linda Beckcom as a result of the misdiagnosis of her breast cancer, Mrs. Beckcom related to the court her present state of mind on March 3, 1983.

Well, first of all, the doctors at Arlington put me on a different type of chemotherapy, and it is not working, and it was basically my last option, so now they are talking about experimental drugs, and I am glad that there is something that can be done by way of experimental drugs, but I have had a lot of time to reflect on the fact that my prognosis is not very good. I think one of the things that disturbs me when I think about death is the fact that if my cancer had been detected earlier, perhaps my life span would be longer. And I have had to deal with bitterness that I felt and the anger that I felt, that I am a young woman, and I have two boys to raise, and nobody can raise them as well as I can. Nobody can love them like I can. I have had to face the fact that I dreamed about things that [my husband] and I could do in our middle years and in our later years, and I don't have that anymore. I have decided that when I die I will do it at home because I want to be surrounded by my family. I don't want a lot of drugs so I can be with them every last minute and fight to the very end, but when it comes to death, I am not scared because I know as much as I know anything, that my love will remain with my family and I will be going home to my Lord.

Tr. of March 3, 1983 at 327–28. Other similar statements by Mrs. Beckcom and her family are present in the record. For example, Mrs. Beckcom testified that in 1981 she felt:

asexual in nature but the only thing that distinguished me as female was that in my mind I knew I was a female, but I had nothing to show that I was a female, I had no outward characteristics of being a female. No hair, no breasts, and no ovaries, and I was taking a male estrogen that gave me facial hair, and a beard that I had to remove somehow. It deepened my voice, and it gave me adolescent acne. I felt castrated. I felt like I was a female in a male body.

Tr. of July 6, 1982 at 70–71. Thus, the claims of mental anguish are well documented.

With regard to the pecuniary loss suffered by plaintiff and his two sons, plaintiff's expert, Harold D. Birckmayer, testified on June 9, 1983. Mr. Birckmayer was offered without objection as an expert in economic projection and testified that the death of Mrs. Beckcom resulted in an economic loss of $531,722.00. Such a figure was arrived at through projecting the value of Mrs. Beckcom's paid and unpaid services during the remaining years of her life as calculated by the standard mortality tables. This figure was then reduced to its present value.

The court has reviewed Mr. Birckmayer's calculations and has considered them in light of his qualifications and finds them to be a reasonable estimate of the economic loss occasioned by Mrs. Beckcom's death. The court notes that the standard mortality tables employed by Mr. Birckmayer are used in cases such as this as a guideline for determining economic loss. In the present case, however, even Mrs. Beckcom did not claim that she would have lived to her normal life expectancy had it not been for the negligence of Dr. Bloomberg. Given the discussion above regarding proximate cause, the court believes that the figure of $531,722.00 is excessive and that a sum considerably below this amount should be

awarded on the wrongful death cause of action.

In his second cause of action plaintiff seeks damages for the loss of comfort, society and consortium of his wife, Linda Beckcom. This is, of course, a derivative claim, and it is now beyond doubt that plaintiff has prevailed in the main claim as executor of his wife's estate.

Both plaintiff and his wife testified as to the effect Mrs. Beckcom's condition had on their relationship. Mrs. Beckcom testified as to her feelings after her mastectomy:

> I hated to get undressed in front of a mirror because it just repulsed me. I didn't like my husband to see me without any clothes on, and I had to actually do it very gradually for him, because he had a lot of trouble looking at it too, and I didn't want to spring it on him, you know, and so I would begin undressing in the dark, and gradually, you know, I would put the bathroom light on so he could see a little bit more, and finally he saw the whole thing.

Tr. of July 6, 1982 at 40.

Plaintiff testified as to the effect of his wife's condition on what had been their normal, healthy sex life. In addition, plaintiff testified that his wife's condition and subsequent death had a negative effect on his ability to achieve a higher rank in the armed forces. Plaintiff's own mental anguish was also evident as he recounted a period of time just before his wife died.

> One night just before I left they put her on a hoist to pick her up so that they could change her bed, and I think that of all the pain and suffering that she had gone through and that she did go through, this was the most difficult for me to take. Here you have a 35-year old woman, no clothes on, no breasts, both legs swollen out of all kind of proportion, her hair was basically gone, her legs were skinny, her face was gaunt and her left arm looked like it had been beaten with a baseball bat, numerous bruises, and they were—the really ugly type—and .... it was really a very, very pathetic situation .... I was very discouraged personally at that time, you know,

to see someone that you love in that type of undignified agony is a little bit difficult to handle.

Tr. of June 9, 1983 at 638–39. The court finds all of the above to be properly included as damages in this case and that plaintiff has proven them to the satisfaction of the court.

Accordingly, the court hereby awards the plaintiff the following damages proved by a fair preponderance of the evidence. On the first and third causes of action, the court awards the sum of Eight Hundred Thousand Dollars ($800,000.00). On the second cause of action the court awards the sum of One Hundred and Fifty Thousand Dollars ($150,000.00). The clerk of the court is hereby directed to prepare a judgment in accordance with the terms of this Memorandum-Decision and Order, and the plaintiff shall be entitled to an award of interest from the date of the judgment.

It is so Ordered.